IN RE TRUST CREATED BY WILL OF JOHN VINCENT
BAILEY, ALSO KNOWN AS J. VINCENT BAILEY
AND J. V. BAILEY.
ELIZABETH ANNA BAILEY AND OTHERS v.
VINCENT K. BAILEY AND OTHERS,
INDIVIDUALLY AND AS TRUSTEES.[1]

February 5, 1954.

No. 35,745.

[1]Reported in 62 N. W. (2d) 829.

144

*Kelly, Levander & Gillen,* for appellants.
*Grannis & Grannis,* for respondents. ·

DELL, CHIEF JUSTICE.

Appeal from an order of the district court allowing the accounts of trustees from January 1, 1947, to December 31, 1950, in pro-

ceedings under M. S. A. 501.34. This matter came to the writer recently on reassignment.

The trustees who prepared and submitted the accounts in question are Vincent K. Bailey, Gordon Bailey, and Elizabeth Fritz, sons and daughter of John Vincent Bailey, deceased. The trust involved was created in and by the last will and testament of the decedent. The objectors to the accounting of the trustees are Elizabeth Anna Bailey, widow, and Virginia M. Bailey and Margaret J. Scott, daughters, of John Vincent Bailey.

For many years the above-named decedent was the sole owner and operator of a successful unincorporated wholesale nursery business at Newport, Minnesota. His will, dated August 23, 1938, after certain specific devises and bequests, placed the residue of his estate, consisting of the assets of the business, in trust for the benefit of the above-named members of his family. His sons, Vincent K. and Gordon, were named as executors in the will. The will provided for three trustees at all times. Vincent, Gordon, and Margaret were named in the original will as trustees, but Elizabeth Fritz later was substituted for Margaret under a codicil to the will. Under the terms of the will, the trustees were directed to carry on the nursery business during the lifetime of testator's wife and for a period not to exceed 20 years after her death. Under paragraph VI(10) of the will it was directed that, after the payment of the expenses of the nursery business, replenishment of emergency funds, care and maintenance of the widow, payment of indebtedness of the business, investment of earnings or capital in the business, and payment of debts left by decedent and all other disbursements deemed necessary or advantageous by the trustees, the remaining net income, if any, be paid by the trustees from time to time during the lifetime of the widow as follows: One-fifth or 20 percent to the widow and the remaining four-fifths to his five children in equal shares of 16 percent.

The will provided that upon the death of the widow the remaining net income should be paid from time to time during the continuance of the trust to decedent's five children in the following proportions: One-third each to his sons, Vincent and Gordon, and one-ninth each

to his daughters, Virginia, Elizabeth, and Margaret. At the termination of the trust the assets were to be distributed one-third to each son and one-ninth to each daughter.

Other provisions, which it is not necessary to discuss here, were made for the event that any of testator's children predeceased him or died during the lifetime of the widow.

At the outset, we must try to determine the testator's intentions and wishes. After a careful examination of the will and the trust provisions in their entirety, it is our opinion that his primary wish and intention was to provide that the nursery business—his apparent lifework—would be carried on, expanded, developed, and improved principally under the management and direction of his sons, Vincent and Gordon, or the survivor. It is also apparent from the document that he reposed great confidence in the managerial ability, as well as the personal industry, of his sons. Under paragraph IX of the will he said that, while he had equal affection for all his children, his sons were responsible in a large measure for the property he had accumulated and that as a reward for their excellent service and co-operation and in keeping with a promise made to them previously, which was not fulfilled because of change in plans, he had given them each a larger share of his estate than he had given his daughters.

Throughout the entire document he has evidenced his faith and confidence in his sons by making them executors of the will and by naming them as two of the three trustees. He then directed, authorized, and empowered the trustees to manage, operate, control, and carry on the business, investing them with all the powers, rights, and privileges which may be exercised by natural persons. He authorized and empowered them, as a necessary incident to the successful management of the nursery business, to buy, sell, and rent land and personal property, construct buildings, borrow money, and manage real estate; to establish a special fund, not in excess of $15,000, to be kept for emergency use in the business and replenished from time to time from income or capital; to cultivate, develop, improve, sell, and remove nursery stock; and to use a part of the net income from the business if they deemed it advantageous to the

business. He expressed a wish that his sons would devote their full time to the business, in the capacity of managers, providing for a monthly salary or such larger salary as the trustees deemed commensurate with the business done, such salary to be a part of the running expenses of the business. He also expressed a wish and desire that his sons ultimately would become the owners of the business. He authorized the trustees, after the death of his wife or at any time during the continuance of the trust if she predeceased him, to sell the nursery business and all real and personal property in the trust for fair value to his sons or, if one of them were dead, to the survivor of them. He requested that a fair and conservative appraisal of the property be made by disinterested persons before such sale and that favorable terms of sale be made so as to enable his sons, or the surviving son, to purchase the trust property from profits of the business and apply their or his beneficial share in part payment.

No one can fail to recognize upon a perusal of the entire document that, while the testator was concerned about the care and support of his surviving spouse and desired to have all his children share in the net income from the business, if any, he firmly desired to have his sons carry on the business and eventually own it, since he acknowledged that they were responsible in a large measure for the property he had accumulated.

The trial court made no findings and issued no memorandum in connection with its order allowing the accounts.

Although numerous objections have been filed, they have been listed and discussed in the briefs under four basic headings: (1) Issues primarily involving accounts; (2) questions concerning compensation of the trustees in their capacity as managers; (3) issues primarily involving accumulation of income; and (4) widow's support and maintenance.

■ The first of the four categories into which the issues presented by this appeal have been classified deals with the propriety of certain accounting practices used to determine the net income of the nursery. A number of questions are raised. First, appellants

contend that the trustees' accounts are neither on a cash basis nor on an accrual basis; that inventories are not valued and certain liabilities are not reported; and that, therefore, it is impossible to determine the true status of the income and capital accounts.

It is true that the duty of a trustee to make annual accounts requires a complete disclosure of the financial transactions affecting. trust property. To fulfill this duty, the trustee is required to keep records which will provide a complete and accurate foundation for the report. Whether or not a particular system of bookkeeping reasonably fulfills this obligation ordinarily is a fact question for the trial court.

The record here contains testimony of a certified public accountant to the effect that, for a business of the nature of the one under consideration, a cash system, using no inventory of growing crops, does permit an accurate and conservative determination of income. Determining the income for a given period of a business of the type and magnitude of the one before the court is not a simple matter of addition and subtraction, and the proper method of determining income cannot be considered a matter of law. There are a number of questions affecting the final determination which must be decided in the light of the expert opinion of persons having knowledge of good and current accounting practice. There was evidence which, in our opinion, would sustain a finding that the accounting system used here was adequate under the circumstances.

Appellants contend also that it was improper for the trustees to charge depreciation on fixed assets to the annual income of the business. They rely on the rule that the beneficiary entitled to receive the income from a trust may not be required to suffer a deduction from the income by way of a charge for depreciation of the trust assets. We do not consider this a proper case for the application of that rule. It seems clear from a reading of the instrument that the testator considered the nursery business as a whole the *res* of the trust created. In the instant case, the business as a whole, not any particular part or asset of it, is the source of income. It is also clear that the testator desired and intended that the business

be continued in the hands of his sons, initially as trustees and, after the termination of the trust, as beneficial owners. Paragraph VI(10) of the will provides for distribution of the net income of the business "After the payment of the expenses of the nursery business." Since depreciation is as much an expense as any of the other business expenses, we consider it proper, under the circumstances of this case, to make a charge for asset depreciation according to good business usage in arriving at the income of the business.

The principle that the trustees may rely on recognized accounting practices also controls the issue raised by appellants regarding the action of the trustees in charging off the value of a patent determined to be useless and in charging against income in 1947 taxes for the year 1946. There was testimony by a qualified accountant that the patent item was charged off in conformance with good business practice. While the record is not complete on the tax item, it appears that the payments and the method of accounting, at least in part, were compelled by adjustments made by the internal revenue department.

Appellants contend that the accounts filed by the trustees do not discharge their duty to make a full and complete disclosure of the trust affairs since the accounts do not contain segregated principal and income accounts. The first account filed covered the period from the commencement of the trust to December 31, 1946. It listed an inventory consisting of one item of real estate and one item of personal property. The account then listed the receipts of the business for each year and the disbursements for the same year, including the disbursements made to the income beneficiaries. The difference between the receipts and disbursements for the year was listed as an "increase" for that year. The inventory and increases were totaled and labeled "TOTAL TRUST ESTATE DECEMBER 31, 1946." The account also contained an inventory of the assets of the trust, which equalled the amount of the total trust estate. The later accounts filed were made out in much the same manner. Appellants argue that, if the accounts properly segregated income and principal, certain improper charges would be revealed.

In passing upon an account of a trustee, much must be left to the sound judicial discretion of the trial court. While there are some deviations from the required statutory requirements in the preparation of these accounts, we are satisfied that, if they are corrected in the future, the rights of all parties can be adequately protected.

■ Appellants question the amount of compensation paid to the two trustee-managers by way of salaries and bonuses for services in managing the business. The instrument creating the trust provided that the trustees shall take as salary "$200.00" per month "or such larger salary as my trustees deem commensurate with the business done." The trustee-managers have followed the practice in recent years of paying themselves a base salary of $8,400 per year. In addition, they have taken a bonus amounting to 25 percent of the net income after taxes. It must be agreed that the method of computation of the bonus of the trustees makes it appear that such payments amounted to a distribution of income. However, in our opinion, the testimony is sufficient to support a finding that the amounts paid are reasonably commensurate with the business done. The volume of business has increased significantly in recent years. There is ample testimony by experienced nurserymen to the effect that $22,000 was a fair compensation for a manager having the experience and ability of the two trustees and producing the results which they did. In the will the trustees were given authority to take a salary which *they* deemed commensurate with the business done. Although no finding was made, it appears to us that the evidence would sufficiently support a finding that the payment of the amounts by the trustees was a fair exercise of the powers granted.

■ Paragraph VI(10) of the will provides:

"After the payment of the expenses of the nursery business, replenishment of emergency funds, care and maintenance of my said wife, payments on indebtedness of the business, *investment of earnings or capital in the business,* debts left by me, and all other disbursements deemed necessary or advantageous by my trustees, I

direct my trustees to pay the remaining net income, if any, from time to time * * *." (Italics supplied.)

Under this clause, the trustees have chosen to refrain from distributing substantial amounts of net income earned since the inception of the trust. During the lifetime of the widow, the trustee-managers' share of the net income of the business is 16 percent each; after the death of the widow, the trustee-managers were each to be given 33 1/3 percent of the net income; and, upon sale of the corpus and distribution of the estate, the trustee-managers are to be given 33 1/3 percent of the corpus. Appellants point out that under these circumstances it is advantageous to the trustee-managers to conserve and add to the corpus. They contend that the accumulation of net income by the trustees violates M. S. A. 500.17 and is void; that, even if not void, the accumulations do not become part of the corpus to be distributed as such but remain income and should be the property of the persons entitled to the income. They further contend that the accumulated income was not used in the business in the sense intended by the testator but was invested in the various securities and held in a reserve account and that such use is contrary to paragraph VI(3) of the will, which provides as follows:

"In connection with the nursery business and as part of it, I authorize and direct my trustees to establish a special fund not in excess of $15,000.00 to be kept for emergency use in such business, and to be created and replenished from time to time from the income or capital of such nursery business."

While prior to 1949 the accounts contained no so-called special fund designated as such, it does appear that commencing with the inventory of December 31, 1949, the account contained varying amounts of bonds and securities well in excess of the $15,000 limit mentioned in paragraph VI(3) of the will.

These contentions raise two basic questions; namely, (1) the extent to which the trustees will be permitted to retain net income either as investment of earnings or capital in the business or as an emergency fund; and (2) the ultimate ownership of funds so re-

tained which might have been distributed to the income beneficiaries. Inasmuch as neither the accounts themselves nor the objections filed thereto raise the issue of the ultimate ownership of undistributed net income and inasmuch as there appears no determination of such issue in the trial court, there is no occasion for this court to pass upon this question at this time. The question of the extent to which the trustees may rightfully withhold the net income of the business for operating capital is largely a question of fact. In this respect the important consideration is a proper segregation of income and corpus of the trusts to the end that a proper determination of ownership of accumulated income may be made when it appears that it is no longer needed for working capital or when the trust may be terminated.

We cannot agree with appellants that this practice of carrying amounts greater than $15,000 necessarily violates the provisions of the will. The language of the provision does not require a construction permanently limiting the emergency fund to $15,000. It may be construed as indicating the testator's concept of a wise limit at which to establish the fund in the then current needs of the business. The provision restricting the size of an "emergency" fund must be read together with the provision in paragraph VI(5) as well as VI(10) quoted above. Paragraph VI(5) provides:

"Should my trustees deem it advantageous to the business to use therein a part or portion of the net income from such business, I hereby authorize them to do so."

Over and above the possible need of a business for an "emergency" fund, it may be determined that the business requires an adequate working capital to meet the regularly recurring business expenses. In addition, liquid assets on hand provide a source from which it is possible to expand the fixed assets of the business. There is no reason to suppose that the testator did not intend that the business should be allowed to carry liquid assets sufficient to provide adequate working capital.

Implicit in the court's order approving the account is a finding that amounts withheld from income were not more than was reason-

able for working capital under the circumstances of this case. Such determination involves a question of fact. The evidence sustains such finding so it must be affirmed. However, we must point out that § 501.34 requires the annual account of a trustee to segregate principal and income. That requirement is mandatory and must be followed in submitting future accounts in order that we may know, when the proper time comes for determining who is the owner of the accumulated income, what is income and what is principal.

Appellants next contend that if the income retained in the business does become corpus then such accumulations are void as a violation of § 500.17. That section provides in part:

"Subdivision 1. Dispositions of the rents and profits of lands, to accrue and be received at any time subsequent to the execution of the instrument creating such disposition, shall be governed by the rules established in this chapter in relation to future estates in lands.

"Subd. 2. An accumulation of rents and profits of real estate, for the benefit of one or more persons, may be directed by any will or deed sufficient to pass real estate, as follows:

"(1) If such accumulation is directed to commence on the creation of the estate out of which the rents and profits are to arise, it must be made for the benefit of one or more minors then in being, and terminate at the expiration of their minority;

"(2) If such accumulation is directed to commence at any time subsequent to the creation of the estate out of which the rents and profits are to arise, it shall commence within the time in this chapter permitted for the vesting of future estates, and during the minority of the persons for whose benefit it is directed, and shall terminate at the expiration of such minority.

"Subd. 3. If, in either of the cases mentioned in subdivision 2, the direction for such accumulation is for a longer time than during the minority of the persons intended to be benefited thereby, it shall be void as to the time beyond such minority, and all directions for the accumulation of the rents and profits of real estate, except such as are herein allowed, shall be void."

In our opinion, this section has no application to the instant case. The statute provides that "all directions for the accumulation of the rents and profits of real estate, except such as are herein allowed, shall be void." Unless a *direction* to accumulate may be found in the will, there can be nothing in it invalid through the operation of § 500.17.

In Gerin v. McDonald (8 Cir.) 64 F. (2d) 394, 396, the court, in commenting upon a South Dakota statute similar to M. S. A. 500.17, said:

"* * * The statute is not aimed at what executors or trustees *may* do, but what the instrument, under which they are acting, says they *must* do."

One reason suggested for this reasoning is that permissive clauses can be more easily regulated by the court. 1A Bogert, Trusts and Trustees, § 217.

The clauses in the will which allow the trustees to invest corpus or income in the business constitute an authorization to use income to preserve and improve the trust corpus so that its earning capacity can be preserved and extended. If the accumulations made under the discretionary power of the trustee are restricted to the purpose of preserving the corpus and making it more efficient for earning purposes, there is no violation of the statute. Matter of Nesmith, 140 N. Y. 609, 35 N. E. 942; Matter of Kaplan, 195 Misc. 132, 88 N. Y. S. (2d) 851; Matter of Forhan, 277 App. Div. 293, 98 N. Y. S. (2d) 757. Whether the application of income made by the trustees in this case was for such a necessary purpose, as we have stated above, was a fact question for the trial court. Such application as may legitimately be made by the trustees under this trust would not constitute a violation of § 500.17.

■ Appellants contend that the payments made to the widow for her support were not adequate under the provisions of the will. The will provides:

"I authorize and direct my trustees to pay to my beloved wife Elizabeth Anna Bailey each month during the term of her natural life should she survive me, a sum sufficient for her comfortable main-

tenance and support, and at such times as she may request, such further reasonable traveling expenses as she may need for an occasional trip; it being my intention that my beloved wife shall at all times have a substantial but not improvident allowance for her comfort and happiness."

In paragraph VI(10) of the will the testator provided that the funds for the care and maintenance of his widow were to be deducted along with business expenses and other items in order to arrive at net income which would be subject to distribution to the beneficiaries of the trust. The record shows that Mrs. Bailey lives in the same house with one of the trustees and that he pays for the heat and food used by her; the nursery pays the utility bills. For the remainder of 1944 after testator's death and during 1945, the trustees paid the widow $150 per month. Beginning in 1946, after a conversation with the widow, this amount was reduced to $100. Under the provisions of the will and under the circumstances of the trust, there can be little question that the widow could demand a greater sum for her support than the amount paid her. However, no request of that kind has been made. She testified that she would prefer to leave the matter to the judge. The only conclusion to be drawn is that she does not believe that the sum is smaller than what is required for her comfortable maintenance and support. Certainly under these circumstances this court cannot decide as a matter of law that some greater figure must be paid to her.

The trustees filed an account covering the period from the beginning of the trust to December 31, 1946. No objection was made to this accounting, and on January 26, 1948, an order was entered allowing the account. Appellants now contend that an item of $6,082 charged as an expense in the year 1944 for taxes was at least in part an improper item. They also contend that an item was improperly charged against the income in the account for 1946. They maintain that the order approving the account is not *res judicata,* since no objections were filed to the account and the accounts on their face do not indicate the true nature of the charge made. In In re Trust Created by Will of Enger, 225 Minn. 229, 238, 30 N. W.

(2d) 694, 701, 1 A. L. R. (2d) 1048, the court discussed the question of what is determined by an order of the court settling and allowing accounts of trustees, saying:

"In a trustee's accounting, the 'matters' involved include the transactions set forth in the trustee's account and the petition for the allowance thereof and the objections thereto, if any. The pleadings consist of the account and the petition on the one side and of the objections thereto on the other. Matter of Hearns, 214 N. Y. 426, 108 N. E. 816. The issues are framed by the account and the petition and the objections thereto as the pleadings in an accounting proceeding. 4 Bogert, Trusts and Trustees, § 969, p. 2820. Here, since there were no objections to the annual accounts, the matters determined by the orders allowing the annual accounts were those put in issue by the accounts and the petitions for the allowance thereof filed by the trustees."

Applying the Enger case to the instant case, appellants contend that the accounts merely show receipts and disbursements and that the only issue to which the principle of *res judicata* may be applied is whether or not such receipts and disbursements were made and the propriety of them. We cannot agree that the issues presented by the account were as limited as appellants contend. The account not only shows that the disbursements were as stated but also indicates clearly that such disbursements were being treated as an expense of the business. The order approving the account therefore forecloses the questions raised by appellants.

Nothing in this opinion is to be taken as authority to the trustees to disregard the rights of all the beneficiaries in the future. Great care must be exercised by the trustees to conduct the business so as to protect the rights of all the beneficiaries. The charging of exorbitant salaries on the part of the trustee-managers not commensurate with the volume or scope of the business or other charges or expenses with the underlying intent of reducing the net income to certain beneficiaries should not be tolerated. While it may be said that the assets and volume of the business expanded greatly during the past several years because of a general business increase

throughout the country, it must also be recognized here that the trustees, Vincent and Gordon, through their efforts, did a great deal to increase the assets and volume of the business and that as a result of these efforts through the years all of the interested parties were benefited. It must also be considered that at the time the testator authorized and directed the trustees to establish a special fund not in excess of $15,000 he did not intend to limit the working capital of the business to this amount. This provision alone does not preclude the retention on hand of sufficient net profits to constitute adequate working capital commensurate with the size and nature of the business. It must be kept in mind that the emergency fund and the working capital of the business are separate and distinct.

Affirmed.

THOMAS GALLAGHER, JUSTICE (dissenting).

The testamentary trust here under consideration authorizes the trustees to carry on the nursery business conducted by the testator prior to the time of his death.

Testator died March 1, 1943. Trustees Gordon Bailey, Vincent K. Bailey, and Elizabeth Fritz took over as of December 27, 1943.

■ The first account of the trustees was filed for the period to December 31, 1946. It contained no itemization of salaries or bonuses for the trustees. While substantial distributable income had been accumulated by that time, it was not set forth as a separate item in this account but was lumped together with principal and designated "net worth." This income thus accumulated has never been distributed to the beneficiaries but has been added to the corpus of the trust. There is nothing in this report to indicate that it was not to be distributed or that the life tenants had lost their respective rights thereto.

■ Subsequent to 1946 no annual accounts were filed by the trustees until April 22, 1950, when the accounts for the years 1947, 1948, and 1949 were filed. They likewise did not separate income from principal but again lumped the two items together under the heading "net worth," and the income thus accumulated is still retained as part of the principal of the trust.

■ At the commencement of this period of accounting, the inventory disclosed supplies on hand in the sum of $2,236. During the year 1947 the account shows disbursements for merchandise in the sum of $20,547.44 and for supplies in the amount of $8,873.57. During 1948 the account shows purchases of merchandise in the amount of $30,501.37 and of supplies in the amount of $7,406.33; and in the year 1949, merchandise purchased in the amount of $34,988.28 and supplies in the amount of $10,032.59. Notwithstanding this total expenditure of $112,349.58 for merchandise and supplies, the inventory furnished with the report of April 22, 1950, still shows merchandise and supplies on hand at the original valuation of $2,236.

■ The trust authorizes the trustees to establish a special fund not in excess of $15,000 to be kept for emergency use in the business. The accounting of December 31, 1946, listed bonds and securities held in the trust in excess of $60,000. By December 31, 1949, this account had an accumulation of over $75,000, and during 1950 for several months it exceeded $100,000. In some of the accounts these investments were designated as "reserve accounts." It is clear that the sums held therein far exceeded $15,000 authorized for this purpose by the trust.

During the year 1950, $25,000 of the amount so held was transferred from the reserve account to cash. Later it was reduced to $56,000, while the cash on hand was increased to over $42,000. These reductions were made after it appeared that a controversy might arise with reference to the management of the trust. The conclusion is inescapable that the sums thus held constituted distributable income to which the beneficiaries were entitled by virtue of the trust, no part of which was ever received by them.

■ Under the trust Gordon Bailey and Vincent K. Bailey were to act as managers of the business and were to be paid each month a salary of $200 or "such larger salary as my trustees deem commensurate with the business done, such salary to be * * * paid regularly as other salaries and wages in the usual course of business." Under this provision, the two trustees took salaries for the

years 1944 through 1950 of $8,400 each per year. In addition, they took bonuses of $1,000 each in the years 1944, 1945, and 1946. In 1947 they took a bonus of $3,500 each. In 1948 and 1949 they each took a bonus of $5,000, and in 1950 each took a bonus of $13,068. These bonuses were in addition to their salary, which remained unchanged at $8,400 per annum.

While it is true that the gross sales of the business increased substantially during this period, had the basic salary of $200 provided for by the trust been increased in proportion to the increased sales for the years 1947 to 1950, inclusive, it would have been as follows:

| | | |
|---|---|---|
| 1947 | $ 9,024 | to each |
| 1948 | 10,464 | to each |
| 1949 | 11,088 | to each |
| 1950 | 11,856 | to each |

This would have meant a salary of $42,432 for each of the trustees, as against the $60,168 which each of them withdrew during this four-year period.

While some increase in the business, no doubt, was due to the efforts of the manager-trustees, we cannot fail to note that perhaps the greatest increase thereof may be attributed to the general business increase experienced by all industry during this period due to conditions brought about as an aftermath of World War II.

■ Since the commencement of the trust, the trustees have accumulated income in excess of $91,000. If the bonuses over and above their salaries as above described had not been withdrawn, the distributable income would have reached a total of $180,372 by 1950.

The disbursements to the beneficiaries, other than the widow, since the inception of the trust have been extremely meager, notwithstanding the substantial amount of income accumulated as above set forth and notwithstanding the substantial increase in sales of nursery products shown as follows:

|  | Receipts from sales, etc. | Disbursements to beneficiaries (each) |
|------|------|------|
| 1944 | $111,829.48 | $ 800.00 |
| 1945 | 129,336.10 | 800.00 |
| 1946 | 143,901.11 | 800.00 |
| 1947 | 189,181.74 | 1,600.00 |
| 1948 | 220,851.78 | 800.00 |
| 1949 | 232,520.77 | 1,200.00 |
| 1950 | 243,520.42 | 2,400.00 |

Since by the terms of the trust each of the manager-trustees is entitled to 16 percent of the income during the lifetime of testator's widow, and subsequent to her death such percentage is to be increased to 33 1/3 percent each, it is obvious that it is to their advantage to withhold distribution of income until subsequent to the widow's death. Likewise, if the transfer of accumulated income to the corpus of the trust be approved, the manager-trustees will each be entitled to one-third thereof when the principal of the trust is ultimately distributed as against the smaller percentage they would now receive were the income paid over to the beneficiaries as required by the terms of the trust.

These operations and surcharges, as well as many others involved in the trusteeship, do not merit judicial approval. The fact that some of the beneficiaries in ignorance of their rights consented to the allowance of the earlier accounts should not alter the obligation of the trustees to distribute to the beneficiaries earned income regardless of the date of its accumulation. The majority opinion gives approval to the acts of the trustees in creating an emergency fund far in excess of that authorized and investing it in securities having no direct relation to the nursery business; in using unrestrained discretion in fixing their salaries and withdrawing bonuses; in denying to other beneficiaries rights clearly and directly expressed by the terms of the trust particularly insofar as the distribution of income is concerned; and in keeping and filing inadequate accounts and reports. That the testator intended that this trust should be administered in this fashion is inconceivable.

For the reasons set forth, I am of the opinion that the trustees' accounts as submitted should not be allowed; that the trustees should be required to submit full, complete, and detailed accounts of their transactions; that all improper charges for expenses, reserve account, depreciation, bonuses, and other like items should be disallowed; and that the trustees thereafter should be directed to distribute to the beneficiaries the net income derived from the trust as then determined, whether previously accumulated or otherwise.

CHRISTIANSON, JUSTICE (dissenting in part).

The will in question is devoid of any reference to a charge for depreciation. It refers only to *payment* of expenses and other disbursements prior to the distribution of the remaining net income. Depreciation, although an operating expense of a business, requires neither a payment nor disbursement of any kind; it is nothing more than a bookkeeping entry representing the gradual exhaustion of tangible assets during the usual course of business. Although this court has never had the occasion to pass upon the question, the often-repeated rule is that, unless the settlor has manifested a contrary intention, an income beneficiary is entitled to all the income of a trust without regard to the exhaustion or wear and tear of the trust assets.[2] However, there is authority supporting an exception to the general rule when the trust assets consist of a business.[3] Despite the inherent difficulties in defining *business*, I am of the opinion that this distinction is sound in principle. For this reason, I concur in the majority's holding that an allowance for depreciation was proper in the instant case.

[2]Evans v. Ockershausen, 69 App. D. C. 285, 100 F. (2d) 695, 128 A. L. R. 177; Hubbell v. Burnet (8 Cir.) 46 F. (2d) 446; Laflin v. Commr. of Int. Rev. (7 Cir.) 69 F. (2d) 460; Whitcomb v. Blair, 58 App. D. C. 104, 25 F. (2d) 528; Matter of Horowitz, 192 Misc. 556, 80 N. Y. S. (2d) 286; Matter of Ottmann, 197 Misc. 645, 95 N. Y. S. (2d) 5; see, 2 Scott, Trusts, § 239.4.

[3]Matter of Jones, 103 N. Y. 621, 9 N. E. 493, 57 Am. R. 775; Re Crabtree, 106 L. T. Rep. 49; Re Rose [1940] 1 D. L. R. 139; see, Matter of Kaplan, 195 Misc. 132, 88 N. Y. S. (2d) 851; 2 Scott, Trusts, § 239.4.

The majority rely on an accountant's statement that writing off the entire book value of a worthless patent against 1950 income was proper. While this may be proper for some purposes, it is not proper in the case of a trust where the rule is well established that income beneficiaries are not responsible for losses to the corpus. In re Trust Under Will of Koffend, 218 Minn. 206, 15 N. W. (2d) 590. The patent in question, which was originally a part of the decedent's estate, was written off because it was determined to be a total loss and, therefore, the total assets of the trust were overstated by the book value of the patent. This situation should be carefully distinguished from the amortization of a patent over the period of its useful life. I would disallow the loss on the patent as not a proper charge against income.

The majority have approved the trustees' accounts for the period from January 1, 1947, to December 31, 1950, with the admonition that income be segregated from principal in all future accounts filed. M. S. A. 501.34 provides in part as follows:

"* * * such trustee shall render to such court at least annually a verified account containing a complete inventory of the trust assets and itemized principal and income accounts."

Regardless of the basis used for reporting income, this section makes the filing of a complete inventory of the trust assets and the filing of segregated principal and income accounts mandatory. The majority agree that these provisions are mandatory and not merely directory. They concede that the trustees have failed to comply with either requirement of the statute and that it is impossible to determine the true status of the principal and income accounts of the trust from the accounts as filed. Moreover, they recognize the necessity of having income segregated from principal because of the large accumulations of income that have been made in this trust. Yet, the majority in effect hold that the requirements of the statute will be satisfied if the principal and income of the trust are segregated in all future accounts filed. To me, this conclusion is not sound in principle particularly in view of the clear and mandatory language of the statute. Moreover, as a precedent it may have the effect of

closing the barn door after the horse is gone, which certainly would be contrary to all principles of justice. I find no justification whatsoever for the failure of the trustees to comply with the requirements of the statute. Their failure to do so in the past has had the effect of concealing such flagrant violations of trust-accounting principles as charging the decedent's personal income taxes against the income of the trust. In my opinion the accounts as filed are inadequate and improper and the trustees should be required to file corrected accounts for the period now in question.

For the foregoing reasons, I respectfully dissent in part from the majority opinion.

MR. JUSTICE NELSON, not having been a member of the court at the time of the argument and submission, took no part in the consideration or decision of this case.