IN RE TRUST CREATED BY KATHERINE B. WARNER.
H. DAVID WARNER v. HAROLD L. WARNER.

117 N. W. (2d) 224.

September 7, 1962—No. 38,267.

*Maslon, Kaplan, Edelman, Joseph & Borman,* for appellant.

*George D. McClintock, Jr.,* and *Faegre & Benson,* for respondent.

*M. V. Seymour, Francis D. Butler, Doherty, Rumble & Butler, Cole Oehler, David W. Raudenbush,* and *Briggs & Morgan,* amici curiae.

KNUTSON, CHIEF JUSTICE.

This is an appeal from an order allowing an account of the trustee in the above entitled trust.

On December 7, 1929, Katherine B. Warner created an inter vivos trust as settlor, in which her then husband, Harold L. Warner, and Warner Holding Company were trustees. Some of the facts relating to this trust may be found in our decision in Doerr v. Warner, 247 Minn. 98, 76 N. W. (2d) 505. So much of the facts relating to the trust as is deemed essential to an understanding of the issues involved in this appeal, in addition to those previously stated in our former opinion, will be stated herein.

The original corpus of the trust consisted principally of shares in three closely held family corporations, namely, Warner Holding Company, Harold L. Warner Company, and Northern States Finance Company. The original trust provided for the distribution of one-third of the net income to Katherine, the settlor, during her life, and two-thirds of the net income to Harold during his life, or all the income

to Harold if Katherine predeceased him. It provided that on Harold's death the trust was to terminate, with one-half of the principal going to Katherine and one-half to their children. There was also a clause in which it was provided that if the Warner Holding Company became insolvent the trust should terminate and all assets be transferred to Harold L. Warner. This clause was deleted and Warner Holding Company removed as a trustee by an amendment of the agreement in 1944.

In 1948, the trust agreement was further amended to extend the duration thereof through the lives of the children of Harold and Katherine so as to give them an interest in the net income after the death of both Harold and Katherine, with the remainder over to the grandchildren of Harold and Katherine.

Harold L. Warner and Katherine B. Warner were divorced some years ago. In 1951, the children, who were then to be income beneficiaries following the death of Harold and Katherine, commenced an action for the removal of Harold L. Warner as trustee and for an accounting. A settlement of that action was made and a stipulation signed in July 1956, under the terms of which Harold resigned as trustee and his son H. David Warner was appointed successor trustee on August 28, 1956, and has since that time continued to act in that capacity. The settlement provided for large distributions to both Harold and Katherine in full settlement of all their claims to income for the entire period prior to the settlement.

In 1958, David Warner petitioned the Hennepin County District Court for approval of his trustee's account for the period from August 28, 1956, to December 31, 1957, in proceedings brought under Minn. St. 501.35. This proceeding will be referred to hereinafter as the 1957 account. After a long hearing, the 1957 account was approved, subject to certain changes in the amount of depreciation deductions that will be discussed hereinafter. No appeal was taken from the order approving the 1957 account, and the time for appeal has now long since expired.

In 1959, David Warner commenced proceedings for approval of his account for the year 1958, which will be referred to hereinafter as the 1958 account. The account was approved by order dated Septem-

ber 19, 1960. Harold L. Warner, one of the income beneficiaries, alone has appealed from that order.

The trust is the sole beneficial owner of Warner Holding Company. At the time of the hearing on the 1958 account the trust owned 1½ percent of the capital stock of Warner Holding Company directly and 98½ percent of stock indirectly through ownership of all the capital stock of Northern States Finance Company. On April 30, 1960, Northern States Finance Company was merged with and into the Warner Holding Company. As a result, the trust became the direct owner of all the stock of Warner Holding Company. Technically, dividends from the Warner Holding Company constitute the trust's principal income. In recognition of this situation, the trustee has filed a supplemental account for Warner Holding Company with each of his trustee's accounts so that the court and the beneficiaries of the trust have been fully informed as to the operation of the Warner Holding Company as well as the trust itself.

Originally, the corporate enterprises owned a portfolio of investment securities. Prior to the 1948 amendment of the trust agreement, several apartment buildings were purchased by Warner Holding Company, and if we look through the veil of the corporate enterprises they would now constitute trust property.

The pertinent portions of the original trust instrument are:

"Second: * * *

"The Trustees shall take, receive, hold and manage all the Trust property, and after paying all proper charges against the same, and expenses thereof, shall pay to the beneficiaries hereunder the net income therefrom and the principal thereof as follows:

"To pay two-thirds of the net income thereof, as may be convenient in the administration of the trust, to my said husband Harold L. Warner during the term of his natural life, or until the termination of this trust and one-third of said net income, to the Transferor during the term of her natural life, or the term of the natural life of the said Harold L. Warner or until the termination of this trust, whichever event may first occur, provided, nevertheless, that nothing in this paragraph 'Second' contained shall be held to limit the provisions of this

agreement set forth in subdivision 'F' of paragraph 'Sixth' hereof. In case said Katherine B. Warner shall die during the existence of the trust, Harold L. Warner shall thereafter receive the entire income from the trust estate.

\* \* \* \* \*

"Sixth: \* \* \*

\* \* \* \* \*

"(f) The Trustees are authorized to treat as principal or income any receipt or any part thereof from the Trust Property and to charge to principal or income any expense or loss, or any part thereof from the Trust Property, as they may in their judgment deem fair and reasonable in the circumstances in each case as it may arise, having due regard to any applicable rules of law."

When the trust agreement was amended in 1948, the second paragraph of the second section was deleted and in its place other provisions were made for payment of the income to beneficiaries, as we have stated above.

The apartment properties and furniture and equipment used therein are carried on the books of Warner Holding Company at $945,843.45. For many years prior to the 1958 account, including the time while Harold L. Warner was trustee and subsequent thereto, a reserve for depreciation was deducted from gross income, and such reserve now amounts to $513,338.45, leaving a net book value of the property as carried on the books of the company as of April 30, 1959, of $432,504.60. Current maintenance and repairs have been taken out of the current income without being charged against the depreciation reserve. The gross operating revenue or rentals from these apartment properties for the fiscal year ending April 30, 1959, was $291,021.54. It is unnecessary to further discuss the financial operations of the property.

In the account submitted for 1957 the trustee took a depreciation deduction of 4 percent of the cost value of the property, both for income tax purposes and trust purposes, in determining net income available for distribution. The court determined that a 4-percent deduction for trust purposes was too high and reduced that amount to 2½ per-

cent. In order to offset the additional taxes that would likely become due in the future as a result of the fact that the property would be depreciated sooner for income tax purposes than for trust purposes, the court allowed the trustee to set up an additional reserve for the payment of additional taxes that might become due in the future. Upon learning that a higher depreciation was deducted for income tax purposes than for trust purposes, the Internal Revenue Department refused to allow a deduction for depreciation for income tax purposes higher than that allowed for trust purposes. As a result, additional taxes were assessed and paid by the trustee, subject to the right of the beneficiary to litigate the validity of it if he saw fit, and, as a result, all the reserve set aside for payment of future income taxes has now been exhausted. The validity of this part of the court's order which originally was involved in the appeal has consequently become moot, and we shall say nothing further about it.

Included in the holdings of the Warner Holding Company were some securities, including common stocks. A comparatively small amount of stock dividends was declared thereon, principally by Northern Pacific Railway Company. It is the contention of appellant that such stock dividends constitute income, and the contention of respondent that they constitute principal of the trust.

A number of important questions are raised by appellant. The most important are: (1) May a trustee, under the inter vivos trust involved here, deduct from cash receipts a reasonable annual reserve for depreciation of property, such as apartment buildings, held as the corpus of the trust where the trust instrument provided for distribution of net income to life beneficiaries? (2) Where the corpus of the trust consists partly of common stock, are stock dividends declared thereon income or principal?

There are a few preliminary questions which should be disposed of before the main thrust of the contending parties is taken under consideration.

Respondent contends that the appeal, in so far as it attacks the court's determination allowing a deduction for depreciation, should be dismissed, first, because it is raised for the first time on appeal, and

second, because the determination of this issue was settled in the 1957 account and cannot be raised in a subsequent accounting.

There may be some merit to respondent's contention that the question may not be raised for the first time on appeal, but inasmuch as proceedings of this kind are continuing in nature, if the question is not answered now, it will arise again, so we may as well dispose of it now.

■ As to the conclusiveness of the determination of the issue in a former hearing, we do not agree with respondent. Under Minn. St. 501.35, an order allowing a final account of a trustee is final and conclusive as to all matters thereby determined. Each such order is appealable, and after the time for appeal has expired it may not be collaterally attacked but stands as a judgment on the matters determined by the order. In re Trust Created by Will of Enger, 225 Minn. 229, 30 N. W. (2d) 694, 1 A. L. R. (2d) 1048. In other words, it is res judicata on the issues of fact involved in the hearing even if based on an erroneous theory of the law. Thus, it is that the validity of a deduction for a depreciation allowed in the 1957 account or in prior accountings may not now be open to question, but that does not mean that the law applied in 1957 may not be questioned in subsequent accounts. Each accounting by a trustee is in actuality a separate proceeding. The fact issues are never the same. Determination of the fact issues concerning the amount of depreciation allowable, if it is allowable at all, may vary from year to year. It is only when the facts are the same that res judicata or estoppel to relitigate the issue applies at all. Nor does res judicata or estoppel usually apply to the law. In Swank v. St. Paul City Ry. Co. 61 Minn. 423, 424, 63 N. W. 1088, we said:

"* * * Estoppel by former verdict extends only to the facts in issue and determined, and does not estop the parties from disputing the doctrines of law applied to the facts in the first suit."

In State v. P. K. M. Elec. Co-op. Inc. 242 Minn. 404, 415, 65 N. W. (2d) 871, 878, involving the taxability of certain property, we said:

"* * * The question of law here may be litigated in this case re-

gardless of what the decision was in the 1945 * * * case, and we so hold."[1]

In discussing the question of res judicata generally, the United States Supreme Court in United States v. Moser, 266 U. S. 236, 242, 45 S. Ct. 66, 67, 69 L. ed. 262, 264, said:

"The contention of the Government seems to be that the doctrine of *res judicata* does not apply to questions of law; and, in a sense, that is true. It does not apply to unmixed questions of law. Where, for example, a court in deciding a case has enunciated a rule of law, the parties in a subsequent action upon a different demand are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases. But a *fact, question* or *right* distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law. That would be to affirm the principle in respect of the thing adjudged but, at the same time, deny it all efficacy by sustaining a challenge to the grounds upon which the judgment was based."

We think that the correct analysis is that in a trust matter the issues actually settled in the hearing may not later be attacked after the time for appealing has expired but that an interested party is not precluded from contending in a subsequent accounting that an erroneous theory of law was applied in settling a prior account. It follows that the applicable law in the hearing on the 1958 account was not settled conclusively by the court's order allowing the 1957 account.

■ Next, appellant contends that the amendment of the trust agreement in 1948 so as to provide different beneficiaries created a new trust. This contention may become important in determining whether the apartments involved came into the trust as part of the corpus on its creation or were acquired with trust principal after its creation.

It is well established that modification of a trust can come about

---

[1]See, also, Gustafson v. Gustafson, 178 Minn. 1, 226 N. W. 412; 10 Dunnell, Dig. (3 ed.) § 5161.

through agreement of the settlor and all beneficiaries. In 3 Scott, Trusts (2 ed.) § 338, p. 2480, we find the following:

"* * * Since they have the power to terminate the trust, they have the power after terminating it to create a new trust. It is unnecessary, however, to terminate the trust first and have the property conveyed to them by the trustee and then reconveyed to the trustee upon a new trust. They can in a single transaction direct the trustee to hold the property upon the modified terms."

It would seem clear to us that the settlor and beneficiaries had no intention of terminating the original trust when the 1948 amendment was adopted. No attempt was made to distribute any of the assets of the trust. No determination of economic appreciation or depreciation for tax purposes was made, nor were any acts done that ordinarily would indicate the end of one trust and the beginning of another. The corpus of the trust remained the same. We therefore hold that the amendment did not create a new trust but was simply an amendment to a continuing one.

■ In the year ending April 30, 1959, Warner Holding Company sold a quantity of old furniture for the sum of $2,811.38. Under the treatment given this property by the parties involved in this appeal, the furniture constituted property that had been fully depreciated through charges made against income prior to August 31, 1956, and was not carried on the books of the corporation as having any value. It is the contention of appellant that, inasmuch as the property had been fully depreciated by the charges made against income, the income beneficiaries are entitled to the salvage realized out of the sale of the property. The proceeds of the sale were all allocated to principal by the trustees.

While this presents an interesting question as to whether income beneficiaries are entitled to the proceeds from the sale of the salvage of property fully depreciated by charges made against income, we do not need to determine this question in this case for the reason that, when the settlement was made by these beneficiaries in 1956 at the time Harold L. Warner relinquished his office as trustee, substantial sums of money were paid to him "in full payment and discharge,

among other things, of all claims by either of them against said trust, or against the corporation substantially owned and controlled by said trust, * * * including all claims for income or accumulations to this trust to the date hereof." Under this settlement, even though appellant as one of the income beneficiaries would have been entitled to the salvage from the sale of fully depreciated property, he has now relinquished those rights by the settlement effected some years ago.

■ One other matter ought to be disposed of before consideration is made of the more important main issues involved. The corpus of the trust consists of the capital stock of Warner Holding Company. It, in turn, owns the apartment buildings involved. The income of the trust, in a strict legal sense, is dividends declared by the corporate entity. However, it is clear that the corporate entity here is used only as a convenient mode of handling the property actually owned by the trust.[2] We shall therefore disregard the corporate intermediary and consider the questions involved as if the trust itself owned the property.

■ We come then to the more difficult question of whether the court correctly held that the trustee could deduct from gross receipts a reasonable amount annually as depreciation of the property of the trust in determining net income.

Authorities here and elsewhere are of little help in solving this problem. In In re Trust Created by Will of Bailey, 241 Minn. 143, 62 N. W. (2d) 829, we discussed some of the problems involved and there held that under the terms of the trust instrument involved in that case the trustee could deduct a reasonable amount for depreciation of a "going business."

In re Estate of Lee, 214 Minn. 448, 9 N. W. (2d) 245, involved an action in which we were mainly concerned with the actions of an attorney acting in a dual capacity in violation of his fiduciary relationship to the beneficiaries of the trust. In passing on this issue, we said (214 Minn. 456, 9 N. W. [2d] 249):

"* * * True, the practice had been discontinued of setting up a

---

[2]See, In re Adler's Estate, 164 Misc. 544, 299 N. Y. S. 542; In re Hubbell's Will, 302 N. Y. 246, 97 N. E. (2d) 888, 47 A. L. R. (2d) 176.

separate cash depreciation account, but the money allocated for depreciation purposes was added to the general fund as part of the corpus of the trust. This bookkeeping change did not alter the beneficiaries' right to the fund, and this appellant knew or should have known if he was faithfully administering his trust."

From the statement it has been inferred that we there held that depreciation could not be charged against income, but it is clear that that issue was neither directly considered nor involved in the case. What we said was purely dicta. Thus, in this state, except to the extent determined in the Bailey trust, the question involved here is an open one.

It would serve little purpose in attempting to reconcile authorities elsewhere. This has been done by others.[3] It is apparent that even the courts in the same state do not agree on the proper rule. Cf. for instance, In re Kaplan's Will, 195 Misc. 132, 88 N. Y. S. (2d) 851,[4] and In re Davies' Estate, 197 Misc. 827, 96 N. Y. S. (2d) 191, affirmed, 277 App. Div. 1021, 100 N. Y. S. (2d) 710.

In considering this question, it is also necessary that we keep in mind just what we are talking about. First and foremost, we must differentiate between physical depreciation and economic depreciation or that which results from causes not involved in this discussion. In a comprehensive article in 4 U. of Fla. L. Rev. 41, the difference is succinctly pointed out. See, also, 46 Minn. L. Rev. 752.

In Lindheimer v. Illinois Tel. Co. 292 U. S. 151, 167, 54 S. Ct. 658, 664, 78 L. ed. 1182, 1192, depreciation is defined as "loss, not restored by current maintenance, which is due to all the factors causing the ultimate retirement of the property. These factors embrace wear and tear, decay, inadequacy, and obsolescence." Economic depreciation might be defined as a diminution in market value brought about by all those causes aside from the loss caused by physical depreciation. What we are here dealing with is physical depreciation alone. It may be conceded that economic depreciation must be absorbed by

---

[3]See, 60 Harv. L. Rev. 952; 4 U. of Fla. L. Rev. 56; 46 Minn. L. Rev. 749.

[4]For a discussion of the Kaplan case, see 48 Mich. L. Rev. 542 and 63 Harv. L. Rev. 180.

the corpus or principal of the trust the same as economic appreciation inures to the benefit of the corpus of the trust.

It is also well to keep in mind that expense in a true sense and expenditure are not synonymous. Expense implies an item of cost in the operation of the property, whether paid or not, and expenditure is an outlay of funds or an incurrence of an obligation.[5] Thus it is that physical depreciation is an expense that is not paid out but which is a replacement of the part of the property which is used up by one of the factors going to make up what we define to be physical depreciation.

In attempting to formulate any rule in this abstract field, it is virtually impossible to announce a rule that will include all cases. There are too many variable factors that must be taken into consideration, and about all that can be done is to formulate general rules that will have application to given facts and consider the question of whether the rules announced apply to future facts as they arise. In 3 Scott, Trusts (2 ed.) § 239.4, p. 1874, in discussing this subject, we find the following statement:

"* * * The rules as to setting aside a reserve for depreciation should not be hard and fast rules, but should be subject to reasonable limitations in the light of all existing conditions."

Proceeding then from these definitions and general propositions that we should keep in mind in considering the whole subject, it is clear that the argument that general business practices should be applied to trust matters cannot be carried out entirely. In business accounting, we deal ordinarily with property owned by an individual or corporate enterprise in which there is no necessity for balancing the respective rights of those entitled to the income and those who eventually will become entitled to the corpus. Usually, the same party or corporate enterprise is interested in both income and principal. Business practices also have been greatly influenced of late years by tax considerations which are not always of the same importance in dealing with trust matters. But there are some aspects of business

---

[5]See, 4 U. of Fla. L. Rev. 43.

practices which have application here. There are, however, so many undefinable variables in trust matters that do not apply to business that care should be exercised in going too far in applying practices that have become current in business to those that will control trust affairs.

There are some propositions that may obviate the difficulty in the future if we understand what rules will be applied. In the first place, the settlor can, if he so desires, express his intentions clearly. The trust instrument can provide either that depreciation may be charged against income or that it may not, and, when so expressed, the intention of the settlor is controlling. But where, as here, there is no such expression, we must attempt to determine whether the settlor, if he had thought of it, would intend that this be done. In arriving at that determination, many things must be taken into consideration, such as whether the property came into the trust at its creation or was acquired after the creation of the trust; the nature of the property and how it is used; and whom the settlor intended to favor the most as between income beneficiaries and remaindermen. There are many other factors that could be mentioned. In this case, for instance, there are two successive sets of income beneficiaries. Did the settlor intend a substantial part of the corpus to be exhausted during the life of the initial income beneficiaries so that the second set of income beneficiaries might not receive anything or at least considerably less than the first or was it his intention that the corpus be preserved so that both sets of income beneficiaries as well as the remaindermen have the full benefit of the entire property?

There is also another consideration that we must bear in mind. Here, the trustee was under no obligation to purchase the apartment buildings at all. He could have kept the trust corpus in "blue chip" stocks or bonds or property of that type that would have no physical depreciation. Apparently a substantial part of the principal of the trust was invested in apartment buildings to increase the earnings of the trust, but, by so doing, the trust acquired property that conceivably could become worthless by depreciation over the life of the trust. Should the remaindermen, under these circumstances, stand this loss or were they, as well as the second set of income beneficiaries, entitled to re-

ceive the benefit of the corpus intact? If they were, it would seem that the only way this could be accomplished would be to permit a deduction from the gross income of the property each year equal to the diminished cost value of the property by depreciation. To do so would maintain the corpus for the production of income as well as for the benefit of the remaindermen, so it is obvious that the income beneficiaries, at least after the lapse of a number of years, are not entirely deprived of the benefit of such deduction.

With these general observations, what law should we adopt? In Restatement, Trusts (2 ed.) § 239, we find the following with respect to the rule applicable to wasting property:

"Unless it is otherwise provided by the terms of the trust, if property held in trust to pay the income to a beneficiary for a designated period and thereafter to pay the principal to another beneficiary is wasting property, the trustee is under a duty to the beneficiary who is entitled to the principal, either

"(a) to make provision for amortization, or

"(b) to sell such property."

Under *illustration 2h* we find the following:

"The rule stated in this Section may be applicable to buildings. Buildings ordinarily tend in course of time to become less valuable, both because of physical deterioration and because they tend to become less suited to their purposes than those more recently built; in other words, they tend to become less valuable through depreciation and obsolescence. Whether the trustee can properly set aside a part of the income as a reserve for depreciation, and whether he is under a duty to do so depends upon the circumstances. Among the circumstances which are or may be of importance are the following: (1) the purposes for which the building is to be used, whether for business purposes, for residential purposes or otherwise; (2) whether the building was part of the trust estate at the time of the creation of the trust or was subsequently acquired by the trustee; (3) whether by the terms of the trust a beneficiary is entitled to occupy the building, or whether it is to be used to produce an income; (4) the likelihood that the building will fall in value and the extent of the probable fall in value.

"If the trust estate includes a building used for business purposes, such as a factory, a hotel *or an apartment house,* the trustee is ordinarily under a duty to set aside a part of the income as a reserve for depreciation, in accordance with the ordinary business customs with respect to depreciation and obsolescence." (Italics supplied.)

Restatement, Trusts (2 ed.) § 233, reads:

"(1)  Except as otherwise provided by the terms of the trust, if property is held in trust to pay the income to a beneficiary for a designated period and thereafter to pay the principal to another beneficiary,

"(a)  the former beneficiary is entitled to, and only to, the net income during such period, and

"(b)  the latter beneficiary is entitled to the principal on the expiration of such period.

"(2)  The net income is ascertained by subtracting expenditures allocable to income from receipts allocable to income."

In 3 Scott, Trusts (2 ed.) § 239.4, many of the cases on the subject are discussed. Thereafter, we find the following statement (p. 1873):

"Now that the principles of accounting are getting to be more generally understood even by those who are not engaged in business, it might be thought that trustees would be required or at least permitted to set aside a reserve for depreciation of buildings."

It is generally acknowledged that, where improvements to buildings which are likely to depreciate in value are made, the cost of the improvement is paid out of principal but is recovered by amortization over the expected life of the improvement. It is difficult to see why there should be a difference between the right of the remaindermen to recover the cost of depreciable improvements by amortization and their right to retain the corpus by recovering investments in depreciable buildings by deducting an amount equal to the depreciation of the buildings during the period of the trust.

In 3 Scott, Trusts (2 ed.) § 239.4, p. 1870, we find the following:

"As we have seen, where the trustee makes improvements which are likely to depreciate in value as time goes on, the cost of the improvements is payable out of principal, but the cost is amortized over the

expected life of the improvement. (See § 233.3.) This is applicable not only to the improvements on buildings which were owned by the settlor and became a part of the trust estate, but also where the trustee erects new buildings."

The rule ought to be the same whether the trustee erects new buildings or purchases buildings already erected.

It is recognized that a life tenant must keep a building in repair during the period of his tenancy. In Rendahl v. Hall, 160 Minn. 502, 504, 200 N. W. 744, 745, 940, we said:

"The law casts upon a life tenant in possession the burden of making such ordinary repairs as are necessary to preserve the property. He receives the rents and profits derived from the use of the property and may not suffer it to go to decay for want of necessary repairs any more than he may impair its value by acts of voluntary waste."

While the rights of tenants for life and remaindermen are not exactly the same as the beneficiaries under a trust, there is some similarity in so far as the obligation of keeping the property at a constant value is concerned, in the absence of an expression to the contrary by the settlor.

It seems to us that the distinction between a rule applicable to a "going business," as in In re Trust Created by Will of Bailey, 241 Minn. 143, 62 N. W. (2d) 829, and rental real estate, as in this case, is too tenuous to constitute a sound basis for a distinction in the application of the rule that is to be followed. To hold that depreciation may be justified in a going business, such as a nursery which consists mainly of real estate used in that business, but may not be permitted where the real estate consists of rental apartment buildings simply defies analysis. It is far more sensible to apply whatever rule we adopt to all depreciable income producing property to the extent that it is used up over the period of the trust. If the idea is to preserve the corpus of the trust, the rule should apply equally to any depreciable corpus in the absence of an expression to the contrary in the trust instrument. What is or is not a "going business" would require a definition in every case.

Taking all matters into consideration, it would seem reasonable to

suppose in this case that the settlor intended the corpus of the trust to remain intact for the benefit of both successive groups of income beneficiaries and the ultimate remaindermen. Conceding that the buildings are depreciable, the only way that could be accomplished would be to permit a deduction from gross receipts of an amount annually equal to the depreciated original cost value of the buildings. To do so protects all income beneficiaries and the remaindermen. We therefore adopt the rule that, where depreciable buildings are acquired with trust funds after creation of the trust, the trustee should deduct from the gross receipts as an expense item an amount equal to the reasonable estimated depreciation of the cost value of the property.

There is a word of caution that should be added. Inasmuch as current repairs are deductible from income and thereby current net income is reduced by the amount of such deduction, such repairs should be taken into consideration in determining what is a reasonable amount to be set aside for depreciation. Thus, if repairs equal depreciation, there should be no deduction. In order to give proper credit for repairs, it is necessary to determine from time to time what would be a fair deduction for depreciation for the period involved in the accounting. If, for instance, a building has a usable life of 10 years, a deduction of 10 percent of the cost price of the building annually may be fair. If, however, after a use for a few years, the building is rehabilitated or repaired to such an extent that the usable life is extended, the deduction for depreciation should then be based upon the then usable life of the building.[6]

In 63 Harv. L. Rev. 181, this thought is expressed as follows:

"* * * Allocations should be frequent, and no excessive allowance, especially for functional factors in depreciation accounting such as obsolescence, should be permitted to accumulate to the detriment of the income beneficiary. * * * This opportunity for periodically reexamining the depreciation rate and the size of the reserve should assure both income and principal beneficiaries a continuously productive and intact investment."

---

[6] See, 3 Scott, Trusts (2 ed.) § 239.4, p. 1874.

■ Some claim, not strenuously argued, has been made that a depreciation reserve against property such as we have here is prohibited by Minn. St. 500.17, which proscribes, except under designated circumstances, a direction for the accumulation of rents and profits from real estate. We think that this contention has been adequately answered in In re Trust Created by Will of Bailey, *supra.* There is here no direction for accumulation of rents and profits of real estate in the instrument itself, and, in addition to that, a deduction for depreciation is an expense and, as such, is not an accumulation at all. Theoretically at least, the amount deducted for depreciation should equal the part of the property used up. The result is that, when the property has been completely exhausted, the depreciation reserve stands in its place. It is simply a replacement of a loss out of income so that the principal remains intact. Accumulation presupposes the addition of something to that which was there to begin with. Deduction for depreciation, on the other hand, adds nothing to what was there to begin with but simply replaces that which was lost. The two are not the same.[7]

■ Part of the trust property consists of securities including shares of common stock of the Northern Pacific Railway Company. During the year ending April 30, 1959, Warner Holding Company received 220 shares of common stock of the Northern Pacific Railway Company as a nontaxable stock dividend on the common stock it held. Appellant contends that this stock dividend constitutes income and belongs at least in part to the income beneficiaries. Respondent contends, and the trial court held, that it belongs to principal.

Throughout the country there are two principal rules[8] followed in the absence of an expression by the creator of the trust. Under the so-called Massachusetts rule, cash dividends are treated as income and all stock dividends as principal. Under the so-called Pennsylvania rule, the source of the dividend rather than its form determines whether and to what extent it is income or principal. Under this rule, such

---

[7]See, 46 Minn. L. Rev. 749; Restatement, Property, § 439, and *comment d.*

[8]There was also a Kentucky rule, which has now become practically obsolete. See, Annotation, 44 A. L. R. (2d) 1280.

dividends are income if declared out of the earnings accruing to the corporation during the period of the trust but are principal if declared out of earnings accruing prior to the creation of the trust.

In Goodwin v. McGaughey, 108 Minn. 248, 122 N. W. 6, we adopted the Pennsylvania rule. It has been followed in In re Trust under Will of Whitacre, 208 Minn. 286, 293 N. W. 784, and In re Trust under Will of Koffend, 218 Minn. 206, 15 N. W. (2d) 590.

The growing complexities of corporate accounting and the difficulties of determining whether a stock dividend comes from earnings and, if so, when it was earned, have led many courts that had followed the Pennsylvania rule, including Pennsylvania itself, the state from which the rule originated,[9] and others who had not adopted any rule, to now follow the Massachusetts rule. It is apparent that a majority of the courts now follow the Massachusetts rule. Like many other states, Minnesota, in 1951, enacted substantially the Uniform Principal and Income Act (Minn. St. 501.47) which adopts the Massachusetts rule. As far as here material, it reads:

"Subdivision 1.    (1) Subject to clause (2), the provisions of this section govern the ascertainment of income and principal and apply in the construction of

"(a) all agreements containing trust provisions entered into subsequent to the effective date of this act;

"(b) all wills made by testators who die subsequent to March 17, 1951; and

"(c) all other wills and trust agreements and trust relations insofar as such terms do not impair the obligation of contract or deprive persons of property without due process of law.

"(2)    A specific provision, contained in any trust instrument or agreement or in any will, which governs the allocation of principal and income, controls such allocation notwithstanding this section.

"Subd. 2.    All dividends on shares of a corporation forming a part of the principal, which are payable only in the shares of the corporation, shall be deemed principal. * * *"

---

[9]Earp's Appeal, 28 Pa. 368; see, Annotation, 44 A. L. R. (2d) 1287.

The trust in this case was established prior to 1951, so subd. 1(1) (a and b) have no application. Appellant argues that to now repudiate the Pennsylvania rule would unconstitutionally deprive the income beneficiaries of property without due process of law. The cases of Will of Allis, 6 Wis. (2d) 1, 94 N. W. (2d) 226, 69 A. L. R. (2d) 1128, and In re Catherwood's Trust, 405 Pa. 61, 173 A. (2d) 86, hold to the contrary. In the Catherwood case the Pennsylvania court reversed its holding in Crawford Estate, 362 Pa. 458, 67 A. (2d) 124, and followed the Wisconsin court in the Allis case. The unworkability of the Pennsylvania rule, under modern conditions, is aptly described by the Pennsylvania court in its latest decision. We think that as far as the constitutional question is concerned these two decisions should be followed.

However, the trial court did not base its decision on the rejection of the Pennsylvania rule. Nor need we do so. The trust instrument provides, among other things:

"The Trustees are authorized to treat as principal or income any receipt or any part thereof from the Trust Property and to charge to principal or income any expense or loss, or any part thereof from the Trust Property, as they may in their judgment deem fair and reasonable in the circumstances in such case as it may arise, having due regard to any applicable rules of law."

While the discretion granted to the trustee may not be arbitrarily exercised for the benefit of the remaindermen and at the expense of the income beneficiaries, it does have some meaning.

In the case of In re Trust Created by Watland, 211 Minn. 84, 92, 300 N. W. 195, 199, we said:

"While the discretion granted to the trustees is broad, no one will contend that the discretion so vested goes beyond sound judgment and a reasonable and prudent discretion. After all, it was the duty of the trustees to exercise their powers and discretion in such fashion as inheres in a fiduciary relation. It could not be exercised unrestrained. They were bound to exercise a 'soundness of judgment which follows from a due appreciation of trust responsibility.' Dumaine v. Dumaine, 301 Mass. 214, 220, 16 N. E. (2d) 625, 629, 118 A. L. R. 834, 840."

In construing such clauses, we should try to determine the purpose the settlor had in including them in the light of the instrument as a whole and to give effect to such purpose. See, Annotation, 27 A. L. R. (2d) 1323.

The settlor could have expressly provided that stock dividends should be considered income or principal under § 501.47, subd. 1(2). What he could do himself he could empower his trustee to do. In In re Trust under Will of Whitacre, 208 Minn. 286, 290, 293 N. W. 784, 786, we said:

"A testator may make any disposition of his stock and the income therefrom consistent with law. After all, he is but disposing of his own property. In a testamentary disposition he may treat that as income which under the laws governing corporations would be regarded as capital and vice versa. 12 Fletcher, Cyc. Corp. (Perm. ed.) § 5391. He may provide in his will that a stock dividend shall be treated as income, In re Estate of Mart, 139 Misc. 558, 248 N. Y. S. 789; or as principal, Bankers Trust Co. v. Lobdell, 116 N. J. Eq. 363, 173 A. 918. *It has been held that he may authorize the trustee acting with others to allocate stock dividends to principal rather than income.* Equitable Trust Co. v. Prentice, 250 N. Y. 1, 164 N. E. 723, 63 A. L. R. 263." (Italics supplied.)

From the language of the clause quoted above it would seem quite clear that the settlor had in mind the possibility of a change in our law. It is not unreasonable to assume that the settlor intended to give the trustee power to determine, from time to time, based upon existing law, where these stock dividends should go. The complexity of corporate accounting and the almost impossibility of applying the Pennsylvania rule to the stock dividends here is sufficient reason for construing the language of the trust so as to give the trustee authority to apply our present statutory rule.

Helpful briefs have been submitted by amicus curiae as well as the parties to this appeal, but we do not believe that this is a proper case in which to determine whether we should now abandon the Pennsylvania rule and apply the statute retroactively to trusts created prior to enactment of the statute. The trial court has placed decision on a

tenable theory without going that far, which decision we should now affirm. We leave determination of the broader question to a future case when it is directly before us.

Affirmed.

MR. JUSTICE THOMAS GALLAGHER took no part in the consideration or decision of this case.