IN THE MATTER OF THE TRUST UNDER THE WILL OF OTTO ARENS, FOR THE BENEFIT OF EDITH ARENS HAGEDORN.

PLAINFIELD TRUST STATE NATIONAL BANK, SURVIVING SUBSTITUTED TRUSTEE, ETC., PLAINTIFF-RESPONDENT AND CROSS-RESPONDENT, v. MARY LOUISE ARENS WOOLLEY, ETC., *ET AL.*, DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS, AND JOHN EDWARD ARENS, *ET AL.*, DEFENDANTS-CROSS-RESPONDENTS, AND EDITH ARENS HAGEDORN, DEFENDANT-RESPONDENT AND CROSS-APPELLANT.

Argued September 9, 1963—Decided January 20, 1964.

Mr. *Alfred C. Clapp* argued the cause for defendants-appellants and cross-respondents (*Messrs. Hetfield & Hetfield,* attorneys for defendant-appellant and cross-respondent Mary Louise Arens Woolley, individually and as guardian *ad litem* for Cheryl Arens Woolley and Richard Schuyler Woolley, Jr.; *Mr. Frank J. O'Brien,* guardian *ad litem* for defendants-appellants and cross-respondents William Arens, Barbara Arens and the unborn issue of Edith Arens Hagedorn and Siegfried H. Arens, attorney *pro se; Messrs. Clapp & Eisenberg* and *Mr. Clapp,* of counsel).

Mr. *Woodruff J. English* argued the cause for defendant-respondent and cross-appellant (*Messrs. McCarter & English,* attorneys; *Mr. English,* of counsel).

No appearance was made or brief filed on behalf of plaintiff-respondent and cross-respondent Plainfield Trust State National Bank, surviving substituted trustee, etc., or defendants-cross-respondents John Edward Arens, *et al.*

The opinion of the court was delivered by

HALL, J.  This case concerns the matter of treatment, as between principal and income, of distributions with respect to corporate securities held as assets of a trust.  Specifically involved are distributions in the form of stock.  The fundamental question posed is whether this court should now change the New Jersey common law rule on this subject as applied to trusts created prior to May 9, 1952.

Before that date, this State, in common with many, had followed, with certain local variants, the so-called Pennsylvania rule, named for the state of its origin, absent any indication of contrary intent by the creator of the trust.  A radically different principle, first enunciated in Massachusetts and therefore known as the Massachusetts rule, prevailed in a large number of other jurisdictions.  Both are, of course, judge-made rules.  Broadly phrased, the Massachusetts rule is one of allocation—an assignment of the whole of a distribution to principal or income, dependent on its form.  The Pennsylvania doctrine, on the other hand, is a rule of apportionment between the two accounts based on the extent to which corporate earnings accruing during the period of the trust are utilized as the foundation underlying the distribution, no matter what form it may take.  Professor Scott explains the distinction in this language:

"Under the so-called Massachusetts rule cash dividends are treated as income and stock dividends as principal.  Under the so-called Pennsylvania rule * * *, it is not the form of the dividend but its source which determines whether and to what extent it is income

or principal. Roughly speaking under this rule such dividends are income if declared out of earnings accruing to the corporation during the period of the trust, but are principal if declared out of earnings accruing prior to the creation of the trust; or, as the rule is commonly stated in Pennsylvania, such dividends are to be treated as income insofar as they do not impair the 'intact value' of the shares at the time of the creation of the trust." (3 *Scott, Trusts* (2d ed. 1956) § 236.3, *p.* 1813.) "]

On May 9, 1952 *chapter* 156 of the laws of that year, *N. J. S.* 3A:14A–1 to 9, inclusive, became effective. That statute generally follows the provisions of *section* 5 of the Uniform Principal and Income Act, 9B Uniform Laws Annotated 365, 373, which, in turn, adopted the common understanding of the Massachusetts rule. It precisely prescribes the allocation of various kinds of distributions in accordance with their form. However, by express provision, it affected only testamentary trusts and estates where the testator died on or after the effective date and to nontestamentary trusts established on or after that date. *N. J. S.* 3A:14A–9. Therefore, New Jersey, like New York and one or two other states which also adopted nonretroactive statutes changing the local version of the Pennsylvania rule, has since had two basically opposite rules on the same subject, one applying to trusts in existence prior to the statute and the other controlling those created thereafter.[1]

---

[1] The practical importance of the common law rule has not evaporated despite the passage of more than a decade since the adoption of the statute. Counsel for the appellants inform us that a recent survey of most of the large corporate fiduciaries in the state shows 2,326 trusts under their administration which were created before the act as against 2,032 becoming operative since. The tendency of many years standing for testators to avoid duplication of federal estate taxes by using the trust device of life estates, as far as legally possible, makes it apparent that many trusts which came into existence before 1952 will remain operative for untold years yet to come. New York's statute was passed in 1926, but a substantial amount of perplexing litigation involving the application of the pre-statute law still appears in its courts. See cases listed in 3 *Scott, op. cit. supra* § 236.3, 1963 *supp., p.* 22.

The question comes to us in the following context. This is a testamentary trust. The testator died in 1910. His will bequeathed the residue of his estate in trust "to collect and receive all the rents, issues, profits, dividends, interest monies and income" thereon and pay over the "net annual income" derived therefrom to successive life beneficiaries. The first of these, the testator's widow, died in 1920. The current "tenant," to use the terminology of the 1952 statute, *N. J. S.* 3A:14A–1(f), is his daughter, the cross-appellant Edith Arens Hagedorn. Upon her death the remaining principal is to be distributed. The identity of all those who have a possible interest in that ultimate distribution, the "remaindermen," again using the statutory term, *N. J. S.* 3A:14A–1(g), was determined by this court in a prior proceeding. *Plainfield Trust Co. v. Hagedorn,* 28 *N. J.* 483 (1958). In still earlier litigation it was decided that the language of the will contained no direction or expression of intent as to how distributions on stock held in the trust should be treated. *Hagedorn v. Arens,* 106 *N. J. Eq.* 377, 379–380 (*Ch.* 1930).

In the present action the trustee sought judicial allowance in the Union County Court of an intermediate account of its administration from 1946 to 1959. During that period, both before and after the effective date of the 1952 act, the trustee received some 34 distributions of stock on the securities which it held of ten nationally known corporations. These included true stock splits, distributions designated as stock dividends ranging from 1% to 100% of the outstanding shares of the particular company, and distributions in the form of shares of stock of a corporation other than the declaring corporation. The trustee had provisionally placed all these distributions in the principal account and, in connection with the accounting proceeding, sought the instructions of the court as to how they should be finally assigned. It expressed doubt, not as to the law applicable to pre-1952 trusts by reason of the passage of the statute, but rather with respect to allegedly uncertain aspects of the common law as related to the treatment of sev-

eral of the particular distributions. It presented two alternative calculations to the court, under one of which the tenant was entitled to share in the distributions to the extent of $76,027.64 and under the other, $42,360.68.

In the trial court, the remaindermen strongly advanced the view that the New Jersey common law rule should be abandoned as to pre-1952 trusts in favor of the Massachusetts rule, which, as has been said, was essentially followed in the 1952 statute. If that course were followed, substantially all of the items involved would appear to be allocable to principal without apportionment, since they were non-cash distributions. Alternatively, the remaindermen contested many items of apportionment in both of the trustee's calculations as erroneous under proper application of our common law. If these contentions were to be upheld, the tenant's apportioned share might be limited to something under $10,000. The tenant urged the retention of the present common law and insisted that she was entitled to the amount shown by the larger of the trustee's calculations under the correct interpretation of that law.

The proofs at the trial, which lasted several days, were voluminous and intricate. The underlying financial details of each of the distributions involved were examined at length through documentary and expert interpretive evidence. This necessitated delving rather deeply into the complexities of theory and practice in modern corporate finance and accounting. In its opinion, 72 *N. J. Super.* 310 (*Cty. Ct.* 1962), the trial court said "* * * that it believes the apportionment rule to be no longer an equitable one and poses serious, and eventually insurmountable, problems in application for fiduciaries, and really is not workable any longer." (at *p.* 320). The quite proper conclusion was reached, however, that any change could only be made at the appellate level. The judge went on to decide that the trustee's smaller calculation by which $42,360.68 of the total stock distributions was apportioned to the tenant represented the proper application of the

common law rule. The appeal of the remaindermen[2] and the cross-appeal of the tenant from the resulting judgment were certified while pending in the Appellate Division.

As we said at the outset, the fundamental question is whether the New Jersey common law rule is now to be discarded entirely. The problem has several facets. The first is whether abandonment is indicated as a matter of sound principle. We believe the answer is strongly affirmative. The second aspect then becomes what the replacement rule should be and whether we can and should make the change, the only effect of which will be upon pre-1952 trusts. Again, we are convinced that we have the power to and should so act. The final query is how a new rule should be made effective and what the result is when applied to the distributions here involved.

Consideration of the merits of discarding our present rule does not require probing too deeply into the ramifications, uncertainties, and, indeed, inconsistencies strikingly displayed in a heavy volume of reported decisions since the adopting cases of *Van Doren v. Olden*, 19 *N. J. Eq.* 176 (*Ch.* 1868), and *Ashhurst v. Field's Administrator*, 26 *N. J. Eq.* 1 (*Ch.* 1875), affirmed *sub nom. Ashhurst v. Potter*, 29 *N. J. Eq.* 625 (*E. & A.* 1878). The decisions are collected and discussed in 5 *New Jersey Practice (Clapp, Wills and Administration)* (*3d ed.* 1962), §§ 436–440 Inc. *Lang v. Lang's Executor*, 57 *N. J. Eq.* 325 (*E. & A.* 1898); *Day v. Faulks*, 79 *N. J. Eq.* 66 (*Ch.* 1911), affirmed 81 *N. J. Eq.* 173 (*E. & A.* 1912); and *McCracken v. Gulick*, 92 *N. J. Eq.* 214 (*E. & A.* 1920), are generally referred to as the leading articulations of the doctrine, though not entirely consistent among themselves. The apparently conflicting nature of two recent lower court opinions, *In re Wehrhane's Estate*, 41 *N. J. Super.* 158 (*Ch.*

---

[2] All possible remaindermen, including unborn issue through representation of a guardian *ad litem*, participated in the trial. Three of the remaindermen in being do not join in the appeal or respond to the cross-appeal. The trustee, an active participant below, also does not appear on the appeal.

*Div.* 1956), affirmed on other grounds 23 *N. J.* 205 (1957), and *In re Terhune,* 50 *N. J. Super.* 414 (*App. Div.* 1958), is strongly illustrative of contemporary uncertainty in the application of our rule.[3] Complete re-examination was foreshadowed by *In re Fera,* 26 *N. J.* 131 (1958), the only case in the field to come before this court in late years, in which we stopped the clock and declined to extend the rule to an aspect which had been included in Pennsylvania. In now undertaking that reappraisal it will be sufficient to recount somewhat broadly, but in a little more detail than already mentioned, the basic theory of the rule and something of the mechanics of its operation in today's corporate world.

The fundamental premise of our rule is two-fold. First, the principal value of stock held in a trust, *i. e.,* the unimpairable interest of the remainderman, is its proportionate share of the corporation's capital and surplus accounts ("intact value") as of the date of acquisition. This date, of course, bears no relation to corporate fiscal periods. Second, the tenant is entitled to all distributions to stockholders grounded in earnings accruing since that date. If the distribution is made from earnings accrued partly before and partly after acquisition, the distribution is apportioned, presumably *pro rata,* pursuant to a fiction that corporate profits are earned uniformly, day by day, like bond interest. (Apportionment is likewise required as between successive tenants of distributions earned partly during one life estate and partly in a succeeding one. *Hagedorn v. Arens, supra,* 106 *N. J. Eq.* 377.[4]

---

[3] The differing viewpoint of these two cases accounts for the alternative calculations submitted by the trustee here. The larger calculation represents allocation to income of the full amount transferred from earned surplus to any capital account to ground a stock dividend, in line with *Wehrhane.* The smaller, following *Terhune,* encompasses only that portion of the transfer which was placed in the capital stock account and does not include that which went into the capital surplus account.

[4] In view of the duration of the instant trust and the current life estate and the fact that the stock involved has been held for the most

Since the rule is not dependent upon the form of the distribution, apportionment is theoretically required even as to ordinary or regular *cash* dividends — a result never imposed even in Pennsylvania, on the thesis that expediency must outweigh principle because of the small amounts involved and disproportionate difficulties in computation. See 3 *Scott, op. cit. supra,* § 236.1, *p.* 1806. Our cases have gone both ways (see 5 *N. J. Practice, Id.* § 438) and in practice, fiduciaries, quite sensibly, rarely apportion such dividends. So-called extraordinary *cash* dividends are, however, clearly subject to apportionment and along with the question of determining when such dividends were earned, the involved and unsettled problem of determining when such a distribution is not ordinary also must be met. See 5 *N. J. Practice, Id.* § 437.

Distributions in *stock* of the declaring corporation are, of course, apportionable with respect to "intact value" under the rule, but the infinitely more difficult preliminary question—in this case the prime one—appears of whether, or how much, the distribution is founded upon earnings and to what extent, in the light of the particular intra-corporate fiscal transfer, that earnings foundation should properly be assigned to income. The source, if not also the purpose, as well as the time of acquisition of that source, has to be ferreted out. Once the ferreting has been done, the New Jersey variant of the Pennsylvania rule gives the tenant, not the stock distribution or a portion of it in kind, but a charge upon the whole in the hands of the trustee for the dollar amount assigned to income, to be realized by sale of a sufficient quantity and transfer of

part for very long periods, the matter of apportionment with respect to "intact value" was of significance as to only one stock distribution. The amount involved was extremely small and the computation complicated, but the remainderman urge that the trustee and trial court erred in not making the apportionment. It may be added that it is not beneficial on the question before us to explore the ultimate refinements of the "intact value" concept and whether, for example, it has all of the connotations in New Jersey as in some other states following the Pennsylvania rule.

the resulting cash. *McCracken v. Gulick, supra* (92 *N. J. Eq.*, at *p.* 218).

The task thus imposed upon a trustee, who nowadays ordinarily holds a portfolio of many corporate stocks, in obtaining sufficient information to make such decisions is Herculean, if not practically impossible in many cases. In modern corporate finance, few stock distributions are simple and their ramifications and complexities are infinite. As the scope of the evidence in this case illustrates, a trustee may not always completely rely on the corporation's say-so, *Bogert, Trusts and Trustees,* §§ 847, 849 (*2d ed.* 1962), and, at the very least, has to obtain more information than is found in formal corporate reports and statements. The depth of the undertaking can be fully imagined without going into further detail. The job in each instance is frequently so expensive as to be self-defeating as far as the beneficiaries are concerned. Every decision is a risky one, for each allocation may later be challenged and a wrong assignment to income, though made on seemingly adequate data and a seemingly proper application of the law, may expose the fiduciary to liability. The result has been in this State that fiduciaries almost invariably assign all stock distributions to principal and await a judicial determination, financially burdensome to the beneficiaries,[5] on an accounting or request for instructions. This course is not to be criticized. As Dean Niles, one of the most eminent authorities on the problem, has said, "* * * at the present time a trustee cannot with safety do anything but hold doubtful distributions in principal account * * *." Niles, "Fos-

[5] This case vividly illustrates the element of expense. The trial court saw fit to allow as fees and disbursements to counsel, *R. R.* 4:55–7(b), and to the expert witnesses, see *Hagedorn v. Arens, supra* 106 *N. J. Eq.*, at *pp.* 382–385, a total of $51,815.50. Counsel for the trustee was allowed $5,500, that for the tenant $13,989.90 and those representing the various remaindermen, $25,825.60. Each of the two expert witnesses received $3,250. All these allowances were directed to be paid out of principal. On a 4% basis, they cost the tenant over $2,000 a year in income, beside the ultimate loss to the remaindermen. No wonder it is often said that the Pennsylvania rule benefits lawyers and accountants more than beneficiaries.

dick, Cunningham and chaos," 98 *Trusts and Estates* 924, 927 (1959).

Perhaps even more significant in the choice of rules than the great practical difficulty in administering the Pennsylvania rule is the matter of whether it is any longer, or indeed ever was, sufficiently equitable as between the divided interests in a trust. Perhaps the inquiry is better put, in view of the long use of the rule, as one of assessing whether modern practical disadvantages now outweigh any equitable benefits.

When a dividend is in cash, both the earned surplus and cash assets accounts of the corporation are reduced. Obviously it intends to, and does, distribute that amount of profits to its shareholders. A distribution in stock is, however, quite a different thing. In the case of the true "stock split," no change whatever is made in any corporate accounts. More shares are issued to present holders simply by reducing par or stated value. There is obviously no distribution in any sense and clearly the new shares belong to, and are always assigned to, trust principal under any rule. A "stock dividend"—an unfortunate label in many instances—involves, on the other hand, a capitalization of earnings by a transfer on the corporate books, from the earned surplus account to a capital account, of an amount fixed by the corporation as the price paid, so to speak, for the new stock issued to the shareholders. Actually this does not amount to a *distribution* of earnings, but rather the opposite — a decision to retain them permanently in the business, presumably as necessary or desirable to assure its growth and stability. This decision, as in the case of declaration of any kind of dividend, is committed to the business judgment of the corporate directors. It is elementary that stockholders may not, except for abuse of discretion, compel the distribution of accumulated earnings. *Agnew v. American Ice Co.*, 2 *N. J.* 291 (1949); see *R. S.* 14:8-20. In reality, since the total corporate property remains the same after a stock dividend, it "* * * simply dilutes the shares as they existed before." *In re Bingham's Will*, 7 *N. Y.* 2d 1, 194 *N. Y. S.* 2d 465, 163 *N. E.* 2d 301,

305 (*Ct. App.* 1959). This conceptual analysis underlies the Massachusetts rule awarding stock distributions to principal (see the original case enunciating the rule, *Minot v. Paine,* 99 *Mass.* 101 (*Sup. Jud. Ct.* 1868)), and was forcefully pointed out in *Ballantine v. Young,* 79 *N. J. Eq.* 70, 74 (*Ch.* 1911), after, however, the die had been cast in this State in favor of the Pennsylvania rule.

Nonetheless, the latter rule awards stock dividends to income, subject to apportionment to preserve "intact value," by adoption of what Judge Fuld in *Bingham* aptly characterized as "\* \* \* the fiction that the capitalization of accumulated earnings, when accompanied by the simultaneous issue of stock, is equivalent to the distribution of those earnings in the form of that stock." (194 *N. Y. S. 2d,* at *p.* 472, 163 *N. E. 2d,* at *p.* 306.) The theory is an attempt at equity. Earnings are being translated into permanent capital and will no longer be available for cash distributions to the stockholder. But this thesis overlooks the previously mentioned fact that the shareholder can almost never compel distribution to him. Furthermore, as Professor Scott points out: "\* \* \* no court has been willing to follow [the rule] to its ultimate logical conclusion, and to treat the earnings of the corporation as for all purposes income to the shareholders." 3 *Scott, op. cit. supra,* § 236.3, *p.* 1818. For example, where permitted by the law of incorporation, a transfer of earnings to capital without accompanying stock issuance results in no financial benefit to a trust income beneficiary. And we have refused to allocate to income that portion of the sale price of trust stock which represented undistributed earnings of the corporation accumulated since the inception of the trust. *In re Fera, supra,* 26 *N. J.* 131. A real possibility of inequity to the tenant does exist, however, if all stock dividends are allocated to principal when such a distribution is actually in lieu of a cash dividend which would have been made but for some corporate or other purpose dictating the issuance of stock. More will be said of this problem later.

Assuming that the Pennsylvania rule had sufficiently substantial equitable considerations to recommend it in the days of simple corporate transactions, too often it now produces substantial inequity in practice. As Dean Niles colorfully observed in the penetrating article previously cited: "The rule of equitable apportionment as applied to stock dividends is bad enough when applied to the common garden variety of stock dividends. It is much worse when applied to some of the exotic hybrids that bloom in the present Wall Street greenhouses—forced by attempts to save taxes and to get wider public participation in stock ownership." Niles, "Fosdick, Cunningham and chaos," 98 *Trusts and Estates* 924 (1959). An illustration taken from the case before us demonstrates the point. This trust held 40 shares of Continental Oil Co. stock. The corporation declared a 100% stock dividend in 1951 and a like distribution in 1957. In each instance, the company increased its capital stock account by the par value of $5 per share for the new shares issued and decreased its earned surplus account by the same amount. The entire surplus, which was more than twice the sum of the capital stock and capital surplus accounts, represented undistributed earnings accumulated during the trust term. The transferred par value of both stock dividends was allocated to income. The proofs developed by the remaindermen showed, however, that the company was engaged in a "wasting assets" business and that a very substantial portion of current earnings must be plowed back each year to find and develop new petroleum reserves. According to the corporation, the objectives of the distribution were (1) to reduce the market value of the shares thereby broadening its market and increasing the number of stockholders (akin to a stock split)[6] and (2) to readjust the capital structure so that the balance sheet would more accurately represent the stockholder's true in-

---

[6] The New York Stock Exchange has a rule that where a distribution exceeds 25%, it is treated as a stock split rather than a stock dividend.

terest in total net assets, without changing the proportionate equity interest of any stockholder. There was no design or intention of anything like a cash dividend or other method of paying out accumulated surplus or net profits and obviously the earnings transferred would never be distributed in cash dividends. Further instances could be cited where the rule in a modern setting is also realistically overgenerous to the tenant.

In other situations, the remainderman's proportionate interest in the corporation may be inequitably reduced even though the "intact value" of the trust holding is not impaired. Take for instance, where a 100% stock dividend is grounded in a transfer from surplus to the capital stock account of the fair (market) value of the new shares, in accordance with New York Stock Exchange requirements. The entire amount would be allocable to income. Although under the New Jersey variant of the Pennsylvania rule, the new stock itself does not go to the tenant, he acquires a charge on it in the amount of the dollar value awarded to him. Presumably the trustee would have to sell all of the stock dividend it received to satisfy the charge, thereby reducing by one-half the trust's proportionate interest in the corporation.

A word should be said about the settlor's intention, ordinarily the controlling consideration in construing his language. The difficulty here is that, by hypothesis, the use of standard trust terminology gives no real clue, and speculation as to probable intent can lead one almost anywhere he wants to go. So as Professor Scott puts it: "The great difficulty with any argument based upon the intention of the settlor is that he generally fails to state his intention. The reason why he does not do so may be and generally is that the question never occurs to him * * *. All that can be said with any confidence is that he would have intended whatever is fair and just, and we have already seen how difficult it is to determine what is fair and just." 3 *Scott, op. cit. supra,* § 236.3, *p.* 1819. Justice Proctor further articulated this thought in connection with the related problem raised by *In re Fera,*

*supra:* "While complete equity is indeed a cherished goal, the courts also must be cognizant of the desirability of developing simple, workable rules of construction, particularly where the attempt to do equity may itself work to the ultimate disadvantage of the participants. Workable rules are after all nearest the testator's probable intent." 26 *N. J.*, at *p.* 144.

The lack of modern merit in the Pennsylvania rule is well summed up by Dean Niles in the article earlier referred to. He characterized the rule as

"* * * out dated, ill-adopted to present corporate financing practices, and unreasonably burdensome now that trustees generally diversify investments. There may have been a time when book value was more reliable than market value, and even when there was some correlation between par value and real value. There may have been a time when earned surplus accounts were used only for present or future dividends. At any rate, times have changed. Trustees generally buy diversified, listed stocks in free unrigged markets. The financial structure of corporations is infinitely more complex than it was in simpler days. We live in a different world from that of Earp's Appeal [28 *Pa.* 368] in 1857 or even that of *Matter of Osborne* [209 *N. Y.* 450, 103 *N. E.* 723, 50 *L. R. A.*, *N. S.*, 510] in 1913. * * * * * * * * * * * the rule (even after a century) is uncertain and difficult to apply. * * * the rule is too expensive to apply. * * * Most important, the rule is wrong in principle because it does not keep in corpus the increase in value through appreciation or inflation. * * * Recent cases make it imperative that we try to hasten the inevitable day when quiet and order will descend on this old battlefield." (98 *Trusts and Estates*, at *p.* 924)

And of highest significance in our appraisal of this State's common law rule is the fact that the Legislature in enacting the 1952 statute must be said to have decided as a matter of legislative policy that the old rule no longer had sufficient merit to permit its continuance as to new trusts. All in all, any equity in favor of the tenant as the reason for its retention with respect to pre-1952 trusts as a matter of principle is clearly outweighed by modern inequities and the difficulties, uncertainties and expense in ascertaining "intact value" and the full details of corporate distributions.

This view accords with that taken by many other jurisdictions in recent times. The Pennsylvania rule, which was predominant until the last 30 years or so, has steadily lost ground to the simple and workable formula afforded by the Massachusetts rule and statutes following it.

The Uniform Act incorporating the Massachusetts rule was approved in 1931, with this comment by the Commissioners:

"The aim followed in the act is that of as simple and convenient administration as is consistent with fairness to all beneficiaries. It is felt, too, that workable rules are often nearest the settlor's probable intent, for he has not probably contemplated extensive and detailed bookkeeping adjustments of the property he has destined for his donees. * * * Experience has shown that, however praiseworthy the intent, the latter [Pennsylvania] rule is unworkable, since neither trustee nor court has the means to value the corporate assets in such way as to secure the fair adjustment aimed at." (9B *Uniform Laws Annotated* 366)

The *Restatement of Trusts,* adopted in 1935, approved the Pennsylvania rule. *Sec.* 236. Thereafter, however, adoption of the Uniform Act by many states and acceptance of the Massachusetts rule by case law in others, demonstrated such a trend toward the latter rule that it was substituted in 1947, *Restatement, Trusts* § 236 (*supp.* 1948), and continues in *Restatement (Second)* § 236. The mother state, Pennsylvania, finally gave up the ghost by substantially adopting the Uniform Act in 1947. *Laws* 1947, *No.* 516, repealed 20 *Pa. Stat., Ann.* §§ 3471–3485 (1947). No uncommitted state has adopted the Pennsylvania rule in late years nor has any Massachusetts-rule jurisdiction shifted to it. Today apparently only four states retain it as to all trusts and only about five others, like New Jersey, still apply it to trusts which antedate a contrary statute. On the other hand 38 or so states, by legislation or case law, now substantially follow the Massachusetts rule as to all trusts or those becoming effective after statutory adoption. Flickinger, "A Trustee's Nightmare: Allocation of Stock Dividends Between Income and Principal," 43 *B. U. L. Rev.* 199, 247–248 (1963). See also *Bogert, op. cit. supra,* § 848, *pp.* 512–513.

■ Indeed, Professor Bogert asserts, like Dean Niles, that "[t]he present problem is \* \* \* not to decide between the two rules, but rather how to escape from the burdens of the administration of the Pennsylvania rule in those states where the older trusts are governed by it." *Bogert, Trusts and Trustees* § 859, at *p.* 563 (*2d ed.* 1962). Before considering the legal permissibility of change affecting previously created trusts, we ought to be quite precise on what our replacement rule should be. While the theory of the Massachusetts rule *is* the only basic alternative, we think a new common law rule for old trusts in this State can be most beneficial by conforming exactly with the provisions of the 1952 act in its present form, *N. J. S.* 3A:14A–1 to 9, and as it may be hereafter amended. This will give us a single, clear formula for the administration of all trusts.

As earlier indicated, the statute now precisely prescribes the allocations of various kinds of distributions in accordance with their form. It is not necessary here to outline all the details, but brief mention of the basic provisions demonstrates how operative difficulties are resolved and the equities balanced in practical fashion. Unless the instrument provides to the contrary, *N. J. S.* 3A:14A–2, "all dividends on shares of stock of a corporation \* \* \* payable in the stock of the corporation declaring such dividend \* \* \*" and "all distributions, whenever made, of corporate assets to stockholders of a corporation \* \* \*, which are designated by such corporation as a return or distribution of capital or a division of corporate property" shall be principal. *N. J. S.* 3A:14A–4, *subd.* A. "\* \* \* [A]ll dividends on shares of stock of a corporation ·\* \* \*, payable otherwise than in the stock of the corporation declaring such dividends, including, by way of description and not by way of limitation, cash dividends, extraordinary and ordinary, and dividends payable in securities of a corporation other than the corporation declaring such dividends \* \* \*" shall be income. *N. J. S.* 3A:14A–5(a). And, except as otherwise specifically provided, the ascertainment and allocation of principal and income in re-

spect to dividends shall be so made regardless of the source, manner or time of the creation or accumulation of the fund out of which such dividends are declared and regardless of the time when they are declared, payable or paid. *N. J. S.* 3A:14A-3, *subd.* B.

The matter of how this statute and a common law rule conforming to it is to be construed ought to be briefly mentioned. While it has been commonly understood that the Massachusetts rule is one of mechanical operation based on the form of the distribution, without requiring inquiry into its substantive nature, a considerable body of case law in that state indicates this may not be entirely true. See Flickinger, "A Trustee's Nightmare: Allocation of Stock Dividends Between Income and Principal," 43 *supra,* 199, 202–208. There does not appear to have yet been any judicial consideration of whether the Uniform Act and statutes, like ours, patterned after it merely codify the Massachusetts rule as developed in that state or whether they are intended to lay down the principle of allocation strictly according to the form of the distribution as their plain language indicates. We are of the mind, since the statutes are intended above all to achieve simplicity and certainty, that we should adopt the latter view and construe our statute to mean exactly what it plainly says.

We recognize that the Massachusetts rule and its statutory counterparts are not a completely equitable solution since the approach is a mechanical one, with consequent elements of arbitrariness. It can be argued that the result is frequently too favorable to the remainderman and not fair enough to the tenant. But as Professor Bogert concludes:

"If a benefit coming from corporate stock, and to be distributed by a trustee, is of doubtful nature, and there is room for real argument whether it should be allotted to trust income, trust capital, or divided between the two, less injustice is apt to be accomplished by allocating the benefit to trust capital than by giving it in its entirety to trust income. If the dividend goes to trust capital, the life tenant will get the value of its use for his life, and the remainderman the balance of its value. Neither party will be excluded from enjoying the corporate benefit entirely. But, if the dividend is awarded to trust income, the

remainderman is permanently excluded from any advantage there-
under." (*Trusts and Trustees*, § 859, *p.* 562 (*2d ed.* 1962))

Allocation of the small stock dividend to principal when it seems probable cash distribution would otherwise have been made, does, however, cause real concern. A few modern corporations have adopted the practice of a distribution of stock in lieu of any cash payment in order to preserve corporate funds, at the same time giving an income tax advantage to the shareholder. Some others, for like reasons, have come to regularly reducing the former usual cash dividend and paying the difference in stock. (There appear to be no instances of either category among the distributions involved in the instant case.)

The problem has had attention in some quarters, generally along the line of providing for the equally arbitrary award to income of all stock dividends below a specified small percentage. A proposal to insert such a provision in the Revised Uniform Principal and Income Act (approved by the Commissioners in August 1962 but apparently not yet adopted by any state) was defeated but the revision does provide that a stock dividend shall be income if the directors declared it to be in lieu of a cash dividend. Bogert, "Uniform Principal and Income Act Revised," 101 *Trusts and Estates* 787 (1962); 1962 *Handbook of the National Conference of Commissioners on Uniform State Laws* 249, 254–255; Dunham, Scott and Wolf, "Uniform Revised Principal and Income Act," 101 *Trusts and Estates* 894 (1962). Pennsylvania, subsequent to its adoption of the Uniform Act and despite the provisions thereof, has judicially assigned stock dividends of 6% or less to the income beneficiary. *In re Trust Estate of Pew,* 411 *Pa.* 96, 191 *A. 2d* 399 (*Sup. Ct.* 1963), criticized in case comments, 112 *U. Pa. L. Rev.* 290 (1963) and 37 *Temp. L. Q.* 104 (1963). See also *In re Catherwood's Trust,* 405 *Pa.* 61, 173 *A. 2d* 86, 93–94 (*Sup. Ct.* 1961). That state has since adopted an amendment to its act incorporating the 6% rule. *Pa. Laws* 1963, *act* 233,

§ 5. Kentucky, for a short period, provided that any dividend under 10% should go to income. *Ky. Acts* 1960, *ch.* 155, repealed by *Ky. Acts* 1962, *ch.* 133. New York has, by *N. Y. Unconsol. Laws* 1963, *ch.* 1005 (*McKinney* 1963), effective June 1, 1964, Personal Property Law, § 17-A, amended its presently nonretroactive statute to allocate to income stock distributions of 6% or less of the number of shares held in the trust, and up to 6% of larger distributions. All of such larger distributions in excess of 6% go to principal. In doing so it purports to abolish all distinctions between stock dividends and stock splits in trust accounting. The statute is retroactive in that it applies to new distributions in pre-existing trusts. Niles, "The New 6% Stock Distribution Rule," 102 *Trusts and Estates* 648 (1963), commenting adversely on many aspects of the statute.

■ While there is much to be said in favor of assigning small stock dividends to income, especially when they are recurring and roughly equivalent to ordinary cash dividends (see Dunham, Scott and Wolf, *supra*) we think the matter is one which should be dealt with legislatively rather than judicially. In the first place, the question of where and how an exact line should be drawn is much better determined by the legislative process. Secondly, we think it most important, as has been said, that we have one plain rule for all trusts and our 1952 statute awards all stock dividends to principal. If and when any statutory amendment may be made, under the rule of this opinion the common law will be automatically changed accordingly, unless, of course, the Legislature expressly provides otherwise.

■ The next inquiry is whether we may validly and properly make the proposed change in our common law affecting trusts in existence prior to the 1952 statute. We see no constitutional barrier. Other courts now uniformly agree. The issue is akin to that raised when a statute commits a state to the Massachusetts rule retroactively. The present Uniform Act is prospective only in its effect. 9B *Uniform Laws Annotated* 387, § 17. (The proposed revised act, applies to any

receipt after the effective date of the statute whether the trust was established before or after that date. 1962 *Handbook, op. cit. supra,* 259, § 14.) However, several state legislatures in adopting a statute founded on the uniform law, expressly gave it application to all trusts created before its effective date. Pennsylvania was one such jurisdiction, but its Supreme Court originally held it could only be constitutionally applied to trusts created after that date. *In re Crawford's Estate,* 362 *Pa.* 458, 67 *A. 2d* 124 (*Sup. Ct.* 1949). Wisconsin was another. It held in the leading case of *In re Allis' Will,* 6 *Wis. 2d* 1, 94 *N. W. 2d* 226, 69 *A. L. R. 2d* 1128 (*Sup. Ct.* 1959), that its retroactive statute was not unconstitutional. Thereafter, the Pennsylvania court, relying upon *Allis,* reversed its position and overruled *Crawford. In re Catherwood's Trust, supra,* 173 *A. 2d* 86. To the same effect are *In re Warner's Trust,* 263 *Minn.* 449, 117 *N. W. 2d* 224 (*Sup. Ct.* 1962) and *In re Gardner's Trust,* 266 *Minn.* 127, 123 *N. W. 2d* 69 (*Sup. Ct.* 1963). Other states have found no difficulty in overruling, even with respect to existing trusts, case law which had established the Pennsylvania rule where either no statute on the subject had been adopted, *Langdell v. Dodge,* 100 *N. H.* 118, 122 *A. 2d* 529 (*Sup. Ct.* 1956), or where the statute did not cover the particular situation, *Farmers Bank & Capital Trust Co. v. Hulette,* 293 *S. W. 2d* 458 (*Ky. Ct. App.* 1956).

In reaching such conclusions, the claim that the income beneficiary has what is labelled a "vested property right" in an apportionment rule was rejected. Typical is the expression of the Wisconsin court in *Allis:*

"It is fundamental that the life beneficiary possessed no vested property right in the earnings of a corporation, shares of whose stock constituted part of the portfolio of investments of the trust at the time of the enactment of the Wisconsin Uniform Principal and Income Act, prior to a declaration of a dividend by the board of directors payable therefrom. * * * We consider it to be equally clear that she also has no vested property right in the rule with respect to the allocation of corporate stock dividends, which had been established by court decision and was in effect at the time of the death of the testa-

trix. Therefore, it is our considered judgment that the legislature could change such rule with respect to any stock dividends subsequently declared without violating the due process clause of the Fourteenth Amendment." (94 *N. W.* 2d, at *p.* 232). |

We are in complete accord. We said in *Fera* that "* * * the apportionment rule is not a rule of property but only a rule of construction utilized to effectuate the presumed intention of a testator, who has failed to manifest any specific intention other than a general direction that 'income' go to the life *cestui* and 'principal' to the remainderman." 26 *N. J.,* at *p.* 143.

In essence, rules regarding allocation of trust receipts properly come within the general area of trust administration. As Professor King said in his thorough article finding no constitutional difficulty in retroactivity: "The label ["vested rights"] represents the conclusion and not the reasoning. In the area of apportionment of stock distributions between income and corpus beneficiaries, the elements of fairness, practicality and changing conditions dictate that freedom be given to lawmaking bodies to promulgate rules applicable to existing trusts." King, "Uniform Principal and Income Act, § 5: Constitutionality Of Its Retroactive Application," 1960 *Wash. U. L. Q.* 339. Other authorities in the field are in accord with his conclusion. *Bogert, Trusts and Trustees,* § 847, *pp.* 505–06; Niles, "Fosdick, Cunningham and chaos," 98 *Trusts and Estates* 924, 927–28 (1959); Comments, 73 *Harv. L. Rev.* 605 (1960) and 112 *U. Pa. L. Rev.* 290, at *p.* 291, *n.* 14.

■ Nor do we think the fact that our Legislature made the 1952 statute applicable only to trusts subsequently coming into existence in any way precludes us from changing the pre-1952 common law. We expressed the view in *Fera* that the exclusion of prior created trusts from the operation of the act did not codify any pre-existing rule governing apportionment, 26 *N. J.,* at *p.* 142, and we do not conceive the Legislature intended thereby to foreclose the courts from changing judge-made law in the same field. But *cf. In re Valiquette's*

*Estate,* 122 *Vt.* 350, 173 *A.* 2d 832 (*Sup. Ct.* 1961), holding
that a legislative intent of prospectiveness precluded changing
the common law rule with respect to distributions in previ-
ously created trusts received prior to the passage of the stat-
ute. Legislative bodies ordinarily shy away from retroactivity
for fear of constitutional implications. And in this instance,
our Legislature acted at a time shortly after our neighboring
commonwealth of Pennsylvania, the only jurisdiction which
had passed upon the question, had held the retroactive
provision in its statute unconstitutional in *Crawford* (67
*A.* 2d 124) and before the Wisconsin court had decided
*Allis* (94 *N. W.* 2d 226) or Pennsylvania had reversed its
position.

Furthermore, we find nothing unfair in any broader
sense in changing the common law rule as to prior created
trusts. Since some rule was made necessary by the lack
of expression of intention or presumably of any thought
about the subject on the part of the settlor, it is difficult
to conceive of any realistic reliance by him on any particular
rule. Probably the most that could be said is, that if
there was reliance on anything, it was only on the general
proposition that "income" would mean what the courts
would say it did as situations arose.

We do not feel, however, that new common law rules we
here lay down should be applied to upset apportionments
or allocations of corporate distributions heretofore made in
fact by trustees, whether or not their accounts for the periods
involved have been judicially settled or otherwise approved.
Where, however, as in the instant case, the assignment was
provisional only, pending anticipated judicial review and
determination, the new rule should now be applied by the
fiduciary.

Turning finally to the matter of application to the instant
case of the principle we have laid down, the judgment of the
trial court, which directed that the stock distributions re-
ceived by the trustee during the period of the accounting
should be allocated in favor of the tenant to the extent of

$42,360.68 as specified in the alternative calculation submitted by the trustee, will have to be modified. If we correctly understand the incidents of each distribution, all, with one exception, belong in *corpus,* but we will order a remand for the purpose of entering the proper judgment rather than finally determining the details here, so that if we misconceive the nature of any distribution the parties may have the opportunity of applying to the trial court for final disposition thereof in accordance with the rule here announced.

The one item which we believe belongs to income is represented by the several· distributions of shares of stock of Standard Oil of New Jersey declared and paid as a dividend by Standard Oil Company (Indiana) of which latter corporation the trust was a stockholder. Although the remaindermen urge that the Indiana Company paid most of the cost of acquiring the New Jersey stock from capital funds and therefore that stock is part of capital, the Indiana company designated the distributions as dividends in kind payable in securities of another corporation and charged the value thereof against its earned surplus rather than denominating them a return or distribution of capital or a division of corporate property. In conformity with the provisions of *N. J. S.* 3A:14A–4, *subd.* A(e) and 3A:14A–5, *subd.* A(a), they belong to income, as the trustee so allocated their value in both of its calculations, and the shares so received should be transferred to the tenant in specie.

The judgment of the County Court is remanded for modification in accordance with this opinion.

*For ·modification and remandment*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL and HANEMAN—6.

, ´Opposed—None.