*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A24-1368**

In the Matter of
the Arthur F. Symens Revocable Trust
created September 21, 2016.

**Filed October 6, 2025
Affirmed in part, reversed in part, and remanded
Smith, John, Judge[*]**

Blue Earth County District Court
File No. 07-CV-22-290

Kenneth R. White, Paul E. Grabitske, Law Office of Kenneth R. White, P.C., Mankato, Minnesota (for appellant Fern Symens)

Elizabeth C. Henry, Christopher P. Renz, Annaliisa P. Gifford, Andrew C. Case, Chestnut Cambronne PA, Minneapolis, Minnesota (for respondents Cathryn R. Cole and Michelle M. Kawohl)

Considered and decided by Larkin, Presiding Judge; Larson, Judge; and Smith, John, Judge.

**NONPRECEDENTIAL OPINION**

**SMITH, JOHN**, Judge

We reverse in part and remand for reconsideration of the sufficiency of the trust accounting because the district court erred in its findings concerning payments made by the trustees to the appellant. We affirm the district court's orders denying appellant's

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

motion to remove the trustees and granting summary judgment on numerous claims because the district court did not err or abuse its discretion. We also affirm the district court's imposition of sanctions under Minn. R. Civ. P. 11 because it did not abuse its discretion.

**FACTS**

Arthur F. Symens (Art), now deceased, was married to appellant Fern M. Symens (Fern). In 2016, Art entered into a trust agreement, which appointed his two daughters, respondents Michelle M. Kawohl and Cathryn R. Cole (the trustees), as successor cotrustees of the trust and made Fern an income beneficiary. The trustees are not related to Fern by blood.

The trust agreement adopted the "powers enumerated" in the Minnesota Trust Code, Minn. Stat. §§ 501C.0101-.1304 (2024). It granted the trustees "the exclusive management and control" of the trust property and, subject to certain exceptions, the power to "determine finally all questions regarding allocations between principal and income with respect to both receipts and expenditures."

The trust agreement contained 14 articles and effectively created two trusts, Trust A and Trust B. Trust A was to consist of assets "selected by the trustees" upon Art's death, with selection dependent upon certain tax considerations. Trust assets not allocated to Trust A would constitute Trust B. Trust A was to be administered under the provisions in article four of the trust agreement. Under that article, the "net income" of "this trust" was to be paid to Fern "in quarterly or other convenient installments but at least annually."

2

Article five of the trust agreement governed the administration of Trust B. In 2019, Art modified article five. Under the modification, the trustees were to pay Fern during her life "the entire net income of and from Trust B in quarterly or other convenient installments." The trust modification also stated: "It is the intent of the donor to provide to" Fern "cash flow from all sources of income of this Trust, but to include social security benefits provided" to Fern "and taking into account all cash distributed" to Fern under Trust A, "that will result in a distribution of cash annually in the amount of at least $120,000 per year and not to exceed the sum of $144,000 per year."

The modification contained a provision addressing real estate known as the "Lake Washington home." Under that provision, any debt secured by a mortgage lien on that property was required to be paid by the trust. Attorney Richard Kakeldey, now deceased, assisted in preparing the trust. He continued to represent Fern after Art's death.

On August 8, 2020, Art passed away, and the trustees worked to establish the trust. The trust configuration involving Trust A and Trust B did not begin until January 1, 2022. Income is generated from Trust A's and Trust B's interests in real property, primarily, a 50% interest in "Lee Estates," a 100% interest in "Regency Apartments," and a 50% interest in "Welcome Apartments."[1] Fern owns the other 50% interest in Lee Estates and Welcome Apartments. Property management company "Connect" manages the properties. Fern began receiving $10,000 per month from Connect in September 2020, a month after

---

[1] The district court's order of April 2024 errantly states that Trust B had a 100% interest in Welcome Apartments in January 2022, but the order subsequently states that the trust has a 50% interest.

Art's death. The trustees sent a letter to Fern in December 2021 stating that if her Social Security information was not received before January 2022, the amount of the monthly disbursements would be reduced to $8,000. After Fern failed to provide that information, the trustees instructed Connect to lower the payment to $8,000 per month. Fern did not provide her Social Security information until December 2023.

In January 2022, Fern filed the underlying petition, asking the district court to compel payment of the debts secured by the Lake Washington home, compel an accounting of the trust, sell jointly owned real estate, and remove the trustees. The trustees generally objected to Fern's petition but agreed to pay the secured debts and provide an accounting.

The district court ordered the trustees to render the accounting by May 31. The trustees timely filed the first accounting, and Fern challenged its accuracy and sufficiency. In October 2022, the trustees moved for judgment on the pleadings. Fern then moved the district court to, among other things, discharge the trustees.

In February 2023, the district court filed an order denying Fern's motion and granting in part and denying in part the trustees' motion, which the court deemed a motion for summary judgment. The district court declined to remove the trustees. The district court ordered the trustees to submit additional documents to resolve ambiguities in the accounting. The district court found that the trustees agreed to pay the debts secured by the Lake Washington home. The district court also addressed the trustees' power to "allocate between Trusts A and B" and "allocate between the income and the principal."

In March 2023, Fern sought to find the trustees in contempt for failing to pay the debts secured by the Lake Washington home. She also moved for clarification regarding

the trustees' power to allocate assets. Before those issues could be resolved, Fern appealed to this court. We summarily dismissed the appeal as premature.

In April 2023, the trustees filed an amended accounting. They also filed tax returns, profit and loss statements, and financial statements. They later filed corrections to the amended accounting.

In August 2023, Fern again moved for clarification on the issue of allocation of trust assets. In September 2023, Fern moved to disqualify counsel for the trustees and raised objections to the amended accounting. She sought to disqualify the trustees' attorneys due to possession of privileged information, specifically, a September 2020 letter from attorney Kakeldey to Fern (the Kakeldey letter). The district court, in December 2023, denied the motion to disqualify, ruling that privilege regarding communications sharing subject matter with the Kakeldey letter had been waived.

In November 2023, the district court issued an order clarifying the trustees' power to allocate assets. The district court concluded that the trustees have an ongoing power to determine between the principal and income within Trust A and within Trust B, and it concluded that the trustees have a duty to provide Fern a minimum of $120,000 per year. The district court required the trustees to show how they met the trust obligation to distribute $120,000 per year to Fern. The district court required Fern to provide evidence of Social Security benefits she received between 2021 and 2023. The district court noted that the mortgage amount on the Lake Washington home was not known but could be determined at trial. The district court did not accept the amended accounting due to disputes regarding attorney fees and errors in labeling distributions as mortgage payments.

5

In January 2024, Fern again moved to remove the trustees. She also requested that the district court render summary judgment on the debts secured by the Lake Washington home, determine that the accounting was legally deficient, and allow for a successor trustee. The trustees moved for sanctions under Minn. R. Civ. P. 11.02 and separately moved for summary judgment on various claims. On January 30, the trustees filed the "third amended accounting" (the Accounting).

In April 2024, the district court filed an order accepting the Accounting and granting summary judgment for the trustees on numerous claims. In August 2024, the district court filed an order awarding the trustees $33,600 in attorney fees as a sanction.

Fern appeals.

**DECISION**

**I.**

Fern argues that the district court erred by accepting the Accounting. The trustee bears the burden of "proving" the trust accounts. *Plunkett v. Lampert*, 43 N.W.2d 489, 493 (Minn. 1950). In making an accounting, a trustee must make "a complete disclosure of the financial transactions affecting trust property," which requires the trustee "to keep records which will provide a complete and accurate foundation for the report." *In re Bailey's Tr.*, 62 N.W.2d 829, 831 (Minn. 1954). "Whether or not a particular system of bookkeeping reasonably fulfills this obligation ordinarily is a fact question for the [district] court." *Id.* We generally review a district court's acceptance of an accounting for an abuse of discretion. *See id.* ("In passing upon an account of a trustee, much must be left to the sound judicial discretion of the [district] court.").

6

Before addressing Fern's arguments, we first provide context. In a separate appeal (A25-0194), this court recently affirmed the district court's interpretation of the trust agreement, holding that Fern is entitled to receive at least $120,000 in trust income, cash flow, and Social Security each year, and holding that the trustees are not allowed to consider sources of income other than those expressly identified in the trust when determining the annual distribution amount. *In re Symens Revocable Tr.*, No. A25-0194, 2025 WL 2502800, at *3-5 (Minn. App. Sept. 2, 2025). We therefore begin our analysis with that holding in mind.

### A.    *Principal and Income; Sufficiency of the Accounting*

Fern first argues that the Accounting is inadequate because it fails to sufficiently separate principal and income. She also asserts that the Accounting is not accurate or sufficient.

The record supports a determination that the Accounting sufficiently documents the trust's financial transactions. The Accounting contains three components. The first covers August 8, 2020, the date of Art's death, to August 15, 2022. It lists a beginning trust inventory of $5,449,973.80, itemized increases in the principal from income totaling $98,808.46, credits, and itemized distributions paid from the trust totaling $5,380,056.04. The second covers Trust A from January 1, 2022, through December 31, 2023, lists a beginning inventory of $893,091.23, lists income as zero, and lists distributions totaling $39,960.20. The third covers Trust B from January 1, 2022, through December 31, 2023, lists a beginning inventory of $578,722.86, list income as zero, and lists distributions as zero.

7

In addition to the Accounting, during the proceedings the trustees submitted tax returns and financial statements addressing the trust's property. The trustees also detailed, in their petition accompanying the Accounting, exactly how they attempted to meet their obligation of providing Fern a minimum of $120,000 each year.

However, central to the district court's determination that the Accounting was sufficient was its finding that Fern had "received all she is entitled to receive under the trust." The district court also made several findings concerning the "trust distribution[s]" that Fern received between 2020 and 2023. For example, the court found that Fern received a trust distribution of $40,000 in 2020. "We review a district court's findings of fact under the clearly erroneous standard." *In re Stisser Grantor Tr.*, 818 N.W.2d 495, 507 (Minn. 2012).

In their petition accompanying the Accounting, the trustees acknowledged that in 2020 "[t]he net income payments from Fern's half of the Lee Estates and Welcome [Apartments] made up $18,366.50" of the $40,000 distributed to Fern. The trustees likewise acknowledged that they relied on income from Fern's separate property in reaching their trust obligations in 2021-2023. The district court therefore clearly erred in its findings underlying its determination that the Accounting was sufficient. Again, this court held that the trustees are not allowed to consider Fern's personal 50% interests in Lee Estates and Welcome Apartments when determining the annual distribution amount. *Symens Revocable Tr.*, 2025 WL 2502800, at *5. The district court's findings concerning the "trust distribution[s]" made to Fern relied on distributions that came, not from the trust, but from Fern's separate property. As such, we reverse and remand for reconsideration of

8

the sufficiency of the Accounting because the trustees used Fern's separate funds to meet their trust obligations. On remand, whether to reopen the record is discretionary with the district court.

### B. *Uniform Principal and Income Act*

Fern next argues that the district court erred in holding that the Uniform Principal and Income Act does not apply to the trust.

Minnesota's Uniform Principal and Income Act (UPIA), Minn. Stat. §§ 501C.1101-.1118 (2024), and specifically, Minn. Stat. § 501C.1112, subd. 1, states that "[a] trustee may adjust between principal and income to the extent the trustee considers necessary to comply with" certain sections of the UPIA "if the trustee invests and manages the trust assets as a prudent investor and the terms of the trust describe the amount that may or must be distributed to a beneficiary by referring to the trust's income." Section 501C.1112 requires several factors to be considered in making an adjustment between principal and income. Minn. Stat. § 501C.1112, subd. 2.

Fern seems to argue that the district court did not require the trustees to consider the factors in section 501C.1112, subdivision 2, and therefore the district court granted the trustees "unlimited discretion through the power of allocation," in violation of the factors, or, in essence, the restrictions, contained in subdivision 2.

The district court determined that the terms of the trust governed. *See* Minn. Stat. § 501C.0105(b) (2024) (stating that "[t]he terms of a trust prevail over any provision of this chapter except" for certain enumerated instances), .1102, subd. 2 ("If a trust instrument gives the trustee discretion in crediting a receipt or charging an expenditure to income or

9

principal or partly to each, no inference of imprudence or partiality arises from the fact that the trustee has made an allocation contrary to sections 501C.1101 to 501C.1118."). The district court wrote, "While there are statutes that address expectations for how a trustee will adjust between principal and income, these provisions do not apply when the trust language explicitly provides otherwise." The district court noted that the trust agreement expressly gave the trustees the power to determine "all questions regarding allocations between principal and income with respect to both receipts and expenditures," with some specific exceptions, and the power to allocate assets between Trust A and Trust B.

The district court did not err. This court reviews a district court's application of the law de novo. *Harlow v. State, Dep't of Human Servs.*, 883 N.W.2d 561, 568 (Minn. 2016). Contrary to Fern's assertion, the district court did not say that the trustees had unlimited discretion, but rather, the discretion outlined in the trust agreement. And Fern fails to point to any specific adjustment between principal and income that runs afoul of section 501C.1112. Indeed, section 501C.1112, subdivision 1, in giving the trustee the power to adjust between principal and income, requires application of "section 501C.1102, subdivisions 1 and 2." Section 501C.1102, subdivision 1 says, as applicable here, a trust is properly administered with respect to the allocation of receipts and expenditures if done in accordance with the trust instrument. And section 501C.1102, subdivision 2, says that if a trust instrument gives a trustee discretion in applying a charge or credit to the income, or principal, or both, then there can be no inference of imprudence merely because an allocation is contrary to section 501C.1112.

In sum, the trust agreement granted the trustees the requisite power to make adjustments between principal and income.

### C.     Fern's Liability to the Trust; Legal Fees

Fern next argues that the accounting was improper because it established that Fern was liable to the trust, which Fern asserts is not permitted except "through separate civil litigation." Fern's argument is unpersuasive.

In *In re Estate of Zych*, three estate beneficiaries had mismanaged assets and owed "significant sums to the estate." 983 N.W.2d 466, 469-70 (Minn. App. 2022). While we held that the district court erred in calculating the amounts owed and in other regards, we otherwise approved of the imposition of the liabilities on the beneficiaries. *Id.* at 477-78.

Contrary to Fern's argument that the trustees improperly "establish[ed]" her liability, it was the district court that ultimately determined that Fern was liable to the estate for certain debts, and we see no error in the imposition of that liability.

Fern also challenges "legal fees charged to Trust B [which] include legal fees from Sandquist Law Firm." The trustees argue that these were expenses properly incurred in the administration of the trust and were therefore permissible. Indeed, the plain language of the trust agreement permitted payment of these fees by granting the trustees the power to "employ attorneys . . . as they shall deem necessary or desirable." The trust agreement expressly permitted the trustees to "charge the compensation of such attorneys . . . against the trust."

11

## II.

Fern argues that the district court abused its discretion by refusing "to take any remedial action towards trustees who engaged in self-dealing and repeatedly failed to accurately or completely account."

Under Minn. Stat. § 501C.0706(b)(1) (2024), a beneficiary may petition to remove a trustee for various reasons, including "a serious breach of trust." "The determination of what constitutes sufficient grounds for the removal of a trustee is within the discretion of the district court." *In re Otto Bremer Tr.*, 2 N.W.3d. 308, 317 (Minn. 2024) (quotation omitted). "Accordingly, the decision whether to remove a trustee is reviewed on an abuse of discretion standard." *Id.*

Fern argues that the Accounting was deficient and that the trustees repeatedly failed to provide an accurate accounting. As previously discussed, the record supports a finding that the trustees sufficiently documented the trust's financial transactions. While the trustees relied on Fern's separate income in satisfying the trust obligations, these actions were the result of a disagreement concerning interpretation of the trust. We fail to see how the trustees were at fault. We conclude that there was no abuse of discretion in declining to remove the trustees based on the Accounting.

Fern also argues that the trustees engaged in self-dealing. It appears that she is referencing (1) personal loans that the trustees made to the trust because the trust lacked sufficient income, and (2) the trustees' use of a storage unit partially owned by Trust A. The district court found that there was "no evidence the [t]rustees have breached any duty to [Fern]." Indeed, Fern fails to adequately explain how the trustees engaged in improper

self-dealing. On this record, the district court did not abuse its discretion in declining to remove or suspend the trustees.

**III.**

Fern argues that the district court lacked "the authority to approve an accounting and grant other affirmative relief" because "there was no consent to litigate beyond the scope of the relief requested in the original petition" and because the trustees did not "follow the statutory process for notice." She argues that some of the issues decided by the district court were not raised in the pleadings. She also asserts that she did not receive proper statutory notice under Minn. Stat. § 501C.0203 (2024) for the summary-judgment hearing. Each argument is addressed in turn.

**A.     *The Decided Issues Were Raised or Litigated by Consent***

Fern argues that her petition only addressed certain issues, and the district court was not permitted to address matters beyond those issues. "It is fundamental that a party must have notice of a claim against him and an opportunity to oppose it before a binding adverse judgment may be rendered." *Folk v. Home Mut. Ins. Co.*, 336 N.W.2d 265, 267 (Minn. 1983). Therefore, a district court "is required to base relief on issues either raised by the pleadings or litigated by consent." *Id.* Consent to litigate an issue "is commonly implied either where the party fails to object to evidence outside the issues raised by the pleadings or where he puts in his own evidence relating to such issues." *Roberge v. Cambridge Coop. Creamery Co.*, 67 N.W.2d 400, 403 (Minn. 1954).

Fern argues that the district court erred in considering (1) the Accounting; (2) refinancing of Regency Apartments; (3) Art's personal income-tax liabilities; (4) Fern's

13

interest in the "CAM2" properties; (5) an Iowa farm and Jeep; (6) the "Sens" promissory note; (7) proceeds from a life-insurance policy; (8) Fern's liability for debts borrowed against Regency Apartments; and (9) Fern's motion for sale of assets.

Fern's argument is unpersuasive for two reasons. First, these issues relate to the accountings and objections to those accountings. The supreme court has stated:

> In a trustee's accounting, the "matters" involved include the transactions set forth in the trustee's account and the petition for the allowance thereof and the objections thereto, if any. The pleadings consist of the account and the petition on the one side and of the objections thereto on the other. The issues are framed by the account and the petition and the objections thereto as the pleadings in an accounting proceeding.

*In re Enger's Will*, 30 N.W.2d 694, 701 (Minn. 1948) (citation omitted).

Second, the issues decided by the district court were raised in Fern's petition and filings. For example, in her petition, Fern requested an accounting, challenged the transfer of Regency Apartments to "CAM" properties and placement of a mortgage on that property, and indicated that the trust had equity in CAM2 properties. The district court acknowledged that the issue of Art's personal income-tax liabilities was not addressed in Fern's petition, but in paragraph 16.1 of Fern's objections to the accounting, in which she asserted that the trust "owes money" to her "for income taxes payable for income tax years 2019 and 2020." The trustees acknowledged, in their motion for summary judgment, that the issue of the Iowa farms was not raised in Fern's petition, but Fern stated in her objections to the amended accounting:

> If [she] or her interest is liable for any debt related to Regency Apartments, or her income reduced by the failure of the

14

trustees to pay off the Regency debt with the life insurance proceeds, then [she] is entitled to be a tenant in common of Regency Apartments and the Iowa farmland with an undivided one-half interest in both and no secured debt to the Iowa farmland.

Fern likewise raised the issue of the Jeep in her objections to the first accounting. The issue of the Sens promissory note was directly related to the accounting and concerned the trust's interest in that note. The issue of the life insurance proceeds was raised in Fern's objections to the accounting. And as found by the district court, Fern asserted that she could not be held liable for debt (an argument that she makes in this appeal) and requested that assets be sold.

In sum, Fern's argument that the district court addressed issues that were not pleaded or litigated by consent is unpersuasive.

### B. No Prejudicial Error from Lack of Notice

Fern also argues that the Accounting was submitted only 14 days before the summary-judgment hearing. She points to Minn. Stat. § 501C.0203, subd. 2, which requires the following:

> Upon the filing of a petition under the district court's in personam jurisdiction by an interested person, the court shall, by order, fix a time and place for hearing. Notice of the judicial proceeding must be given by an interested person to the current trustees and the qualified beneficiaries in the same manner as set forth under Rule 4 of the Rules of Civil Procedure by serving a copy of the order for hearing and the petition at least 15 days prior to the hearing unless waived in writing by the current trustees and the qualified beneficiaries. . . . The district court shall have the discretion to order that notice of the judicial proceeding may be given in any other manner as the court directs.

15

A district court may modify the time limits in the rules. Minn. Gen. R. Prac. 115.01(b). However, "in no event shall the motion be served less than 14 days before the time fixed for the hearing." Minn. R. Civ. P. 56.02; *see* Minn. Gen. R. Prac. 115.01(b) ("The time limits in this rule are to provide the court adequate opportunity to prepare for and promptly rule on matters, and the court may modify the time limits . . . ."). This court reviews a district court's application of the law de novo. *Harlow*, 883 N.W.2d at 568.

Here, the trustees filed their motion for summary judgment on January 16, 2024, and listed a motion hearing date of February 13, 2024. The matter was heard on February 13, 2024. Under Minn. Gen. R. Prac. 115.03(a), dispositive motions must be served and filed at least 28 days before the hearing. And Fern does not dispute that she received notice for the dispositive motion. Rather, Fern asserts that the Accounting was submitted only 14 days before the summary-judgment hearing.

Indeed, the Accounting was not filed until January 30, 2024. However, Fern fails to cite to any rule requiring that an accounting be submitted at some set interval prior to a dispositive-motion hearing, and she fails to identify any specific prejudice stemming from the timing of the filing of the Accounting. *See Bloom v. Hydrotherm*, Inc., 499 N.W.2d 842, 845 (Minn. App. 1993) (stating that the appellant bears the burden of showing that an error was prejudicial), *rev. denied* (Minn. June 28, 1993).

Fern points to a nonprecedential opinion from this court, *In re Estate of Sukut*, in which this court determined that a district court erred in removing a trustee without proper notice under section 501C.0203, subdivision 2. No. A17-0748, 2018 WL 576769, at *3 (Minn. App. 2018). But *Sukut* is nonprecedential and distinguishable because it involved

16

a petition under Minn. Stat. § 501C.0201(a) and was therefore subject to the rule governing in personam petitions in Minn. Stat. § 501C.0203, subd. 2. *See id.* Fern does not challenge notice for a hearing on the filing of a petition but rather notice for a summary-judgment hearing. Therefore, Minn. Stat. § 501C.0203, subd. 2, is inapplicable. Also, "Sukut's former counsel wrote that she did not know that Sukut's position as trustee was at issue during the hearing." *Id.* at *2. Here, Fern possessed the Accounting prior to the hearing.

In sum, Fern's argument that the district court failed to adhere to the notice requirements in Minn. Stat. § 501C.0203 is unpersuasive.

**IV.**

Fern argues that the district court "erred by granting summary judgment to the trustees and ending the case where there are multiple unresolved items in the original petition." Specifically, she argues that the district court failed to resolve "the mortgage debt and the multiple breaches of trust shown on the accounting." "When there are genuine issues of fact which are unresolved, disposition by means of a summary judgment is inappropriate." *Betlach v. Wayzata Condo.*, 281 N.W.2d 328, 328 (Minn. 1979).

As to the mortgage debt, the trustees argue that Fern is misrepresenting the district court's summary-judgment order and that there are no unresolved issues. Indeed, the district court, on the issue of the mortgage debt, concluded as follows:

> This issue seems to be resolved however the amount had not been established and the final amount *now* known based on the decisions in this [o]rder regarding issues which affect resolution. Any delay in payment *up to now* was caused by the ongoing litigation and the need for final determination of these issues.

17

(Emphasis added.)  The Accounting addresses "[m]ortgage liabilities owed to Fern," and lists the amount owed as $408,100.67.  The issue was resolved.

As for Fern's claims that the trustees breached their fiduciary duties, the district court addressed Fern's claim when it denied her request for removal of the trustees and found that the trustees had not abused their powers.  Fern argues that the Accounting shows a breach of loyalty "upon the face of the accounting" because income of the trust was used "to pay principal payments that benefit the trustees."  But she fails to explain her allegations or make a specific citation to the record.  "An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on appeal unless prejudicial error is obvious on mere inspection." *State v. Modern Recycling, Inc.,* 558 N.W.2d 770, 772 (Minn. App. 1997) (quotation omitted).  Again, the trustees had the power to allocate between income and principal.  We fail to see any prejudicial error.

Fern also argues that the Accounting shows "a breach of the duty to inform and report" based on the failure to separate income and principal.  But as previously discussed, the Accounting was sufficient in that regard under the circumstances.

In sum, Fern has failed to meet her burden to show error in the district court's grant of summary judgment.  *Waters v. Fiebelkorn*, 13 N.W.2d 461, 464-65 (Minn. 1944) (stating that the appellant bears the burden of affirmatively establishing errors that occurred below).

18

# V.

Fern argues that the district court erred in granting the trustees' motion for sanctions because the trustees did not comply with the procedural requirements of Minn. R. Civ. P. 11 and because Fern's attorney made "a good faith argument."

Under Minn. R. Civ. P. 11.02, by presenting a motion to the district court, an attorney represents that the motion "is not being presented for any improper purpose"; the claims and other legal contentions "are warranted by existing law" or "a nonfrivolous argument" for a change in the law; and the factual contentions have, or will likely have, evidentiary support.

Under Minn. R. Civ. P. 11.03, a district court may impose sanctions on an attorney or party for a violation of rule 11.02 after notice and a reasonable opportunity to respond. A motion for sanctions must be "made separately from other motions or requests" and "describe the specific conduct alleged to violate [r]ule 11.02." Minn. R. Civ. P. 11.03(a). Under a safe-harbor provision, after service of the motion, it "shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged document, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." *Id.* We review a district court's award of sanctions under rule 11 for an abuse of discretion. *In re Est. of Flatgard*, 14 N.W.3d 305, 313 (Minn. App. 2024), *rev. denied* (Minn. Mar. 18, 2025).

In October 2023, Fern moved to disqualify the trustees' counsel for possessing "privileged information," the Kakeldey letter to Fern that "[s]omehow" came into the possession of the trustees' attorneys. Fern acknowledged in her motion that seeking

disqualification based on possession of privileged information was "novel" in Minnesota. The district court denied Fern's motion, finding that Fern had produced the Kakeldey letter in discovery, used it in her deposition of the trustees, and shared it with her son-in-law, and therefore any privilege was waived. The district court stated, "This is an extreme allegation by [Fern] which does not have factual support."

On September 13, 2023, the trustees served Fern with a motion for sanctions under rule 11 based on Fern's motion to disqualify. The trustees argued that Fern's motion lacked a factual or legal basis because the Kakeldey letter was not privileged. The trustees argued that the Kakeldey letter was provided to Cole and Fern's son-in-law "years ago" and was publicly filed with the court.

On January 16, 2024, the trustees filed a motion for sanctions against Fern pursuant to Minn. R. Civ. P. 11, Minn. Stat. § 549.211 (2024), and Minn. R. Civ. P. 26. The motion stated that the matter would be heard by the district court at 2:00 p.m. on February 13, 2024.

In April 2024, the district court filed an order granting the trustees' motion for sanctions and awarded them attorney fees and costs necessary to respond to Fern's motion to disqualify. The court concluded that Fern's "theory for disqualification is both factually and legally unwarranted." In August 2024, the district court filed an order awarding the trustees $33,600 in attorney fees.

Fern first argues that the trustees failed to follow the proper procedure in seeking sanctions. She claims that the motion that the trustees filed "is not the same motion that was originally served" on her because the filed motion included different "dates and

20

hearing information" not in "the original motion" and sought additional bases for relief, including "discovery relief."

While the filed motion included dates and hearing information, and the served motion did not, we fail to see how this constituted error. Given the safe-harbor provision in rule 11.03, it would be wasteful to obtain a hearing date for inclusion in a served motion if the sanctionable conduct was remedied, thereby removing any need for a hearing. *See* Minn. R. Civ. P. 11.03(a)(1) (stating that motion shall not be "presented" to the court unless the safe-harbor period has passed). Moreover, Fern does not allege that she failed to receive notice of the hearing, and therefore we fail to see any prejudice. *See Bloom*, 499 N.W.2d at 845.

As for Fern's argument that the filed motion sought discovery relief, Fern is correct that a motion for sanctions must "be made separately from other motions or requests." Minn. R. Civ. P. 11.03(a)(1). In their sanctions motion, the trustees sought to compel disclosure of certain communications related to the Kakeldey letter. The district court had previously ruled, "The waiver of privilege of the letter is intentional, therefore any communications that share subject matter should in fairness be disclosed." The trustees sought disclosure of these communications in their sanctions motion. Because the trustees' motion to compel was sufficiently connected to their request for sanctions, we cannot say that the district court abused its discretion by implicitly determining that it was not a separate motion or request. *See id.* Additionally, rule 11.03(b) permits a district court to impose "directives of a nonmonetary nature," and the trustees were therefore permitted to seek such relief via their motion to compel.

Fern also complains that the served motion for sanctions sought relief solely under rule 11, while the filed motion also sought relief under Minn. Stat. § 549.211 and Minn. R. Civ. P. 26. However, the district court granted sanctions under rule 11, not section 549.211 or rule 26. Therefore, Fern suffered no prejudice from the trustees' request for relief under section 549.211 and rule 26. *See Bloom*, 499 N.W.2d at 845.

Fern next argues that her motion to disqualify the trustees "was not legally or factually frivolous" because the motion "cited more than two dozen cases from foreign jurisdictions."

"[C]ourts should construe rule 11 somewhat narrowly to avoid deterring legitimate or arguably legitimate claims." *Brown v. State*, 617 N.W.2d 421, 427 (Minn. App. 2000) (quotation omitted), *rev. denied* (Minn. Nov. 21, 2000). "Sanctions should not be imposed when counsel has an objectively reasonable basis for pursuing a factual or legal claim or when a competent attorney could form a reasonable belief a pleading is well-grounded in fact and law." *Leonard v. Nw. Airlines, Inc.*, 605 N.W.2d 425, 432 (Minn. App. 2000) (quotation omitted), *rev. denied* (Minn. Apr. 18, 2000). It is an abuse of discretion to impose sanctions against an attorney who, in good faith, brings an arguably legitimate claim. *See Brown*, 617 N.W.2d at 427-28.

The foreign-jurisdiction cases cited in Fern's motion to disqualify support the argument that there may be grounds for disqualification of counsel based on an inadvertent disclosure of privileged information. *See, e.g.*, *Moriber v. Dreiling*, 95 So. 3d 449, 454 (Fla. Dist. Ct. App. 2012) (setting forth the elements to consider when addressing whether "inadvertent disclosure warrants disqualification"). Nonetheless, the district court did not

abuse its discretion because any privilege over the Kakeldey letter had been clearly waived. *See id.* (requiring that the inadvertently disclosed information be protected by privilege or confidentiality). Because there was no arguably legitimate claim in Fern's motion to disqualify, the district court did not abuse its discretion by imposing sanctions.

**Affirmed in part, reversed in part, and remanded.**